Per Curiam :
This case was referred pursuant to Buie 45 to Herbert N. Maletz, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed October 18, 1962. Exceptions to the commissioner’s report were taken by the plaintiff, a brief was filed by the defendant and the case was submitted to the court without argument of counsel. Since the court is in agreement with the findings and recommendations of the commissioner, subject to correction of a clerical error and deletion of one sentence, it adopts the same, as amended, as the basis for its judgment in this case.
The commissioner’s opinion as approved by the court is as follows:
The sole issue in this case is the amount of damages plaintiff is entitled to recover by reason of defendant’s breach of contract.
Plaintiff, Dale Construction Co. (Dale), is a Massachusetts corporation which, as low bidder, was awarded a contract by the Civil Aeronautics Administration (C.A.A.) on December 20,1951, pursuant to Schedules VII and VTII, for replacement of portions of Instrument Landing Systems at the Teterboro, New Jersey, Air Terminal and the West-chester County Airport, White Plains, New York. The estimated contract price for Teterboro was $8,872.50; for White Plains, $8,856.00. The nature of the work to be performed under each Schedule was virtually identical but due to later revisions, the final contract price of Schedule VII, as completed on June 20,1951, was $9,512.09.
Under the contract, Notice to Proceed on both Schedules was to be issued by C.A.A. to become effective about April 1, 1951. However, plaintiff exercised a contract right to have *827 these Notices staggered ten days. On April 19, 1951, Dale received a Notice to Proceed on Teterboro, but was never issued a Notice to Proceed on White Plains.
On May 6, 1951, the contractor inquired as to when it might expect to receive a Notice and received a reply from the C.A.A. that changes in the work probably would be required due to an extension in the runway at the White Plains airport being made by the State of New York to accommodate the Air National Guard. The C.A.A. added that “you may expect to receive revised plans from us shortly after July 1, 1951, upon which you may submit new quotations but that if it were not legally possible to equalize the existing contract, it would be necessary to issue new Invitations to Bid. Not until nine months later, in March 1952, did plaintiff receive further written advice from the C.A.A. concerning the White Plains portion of the contract, and then only to be advised by the agency that it appeared in the best interests of the Government not to have the work done and that the contract was, therefore, considered closed. This communication was followed by another in April 1952 in which the C.A.A. sent plaintiff a proposed release for all claims. Plaintiff quite understandably declined to sign the release unless it were paid for certain labor and material expenditures in connection with the White Plains job. Subsequent efforts by the parties to reach an administrative settlement were not successful. This may have been due to the fact that the plaintiff was dilatory in prosecuting its claim and failed to supply the C.A.A., as requested, substantiating documentary information.
The evidence of record shows that the plaintiff suffered damages by reason of the breach in the amounts set forth below.
Item 1: Expenditures for lumber, labor and miscellaneous materials. To prove entitlement plaintiff’s witness Bobbins, the treasurer and principal stockholder of Dale, testified,[1] but without presenting supporting documentary information, that the company had expended $1520.97 for specifically identified items of lumber, labor and miscellaneous materials *828 for the Teterboro and White Plains projects. Plaintiff claims that one-half of this expenditure is applicable to White Plains and on this basis says it is due $760.49 (one-half of $1520.97).
An examination by defendant’s accountant of plaintiff’s records — consisting of canceled checks, checkbooks, payroll books, memoranda, letters and invoices, but not books of original entry which were not available — resulted in verification of a total expenditure on both projects for these items of only $543.81. Conceding that one-half of the expenditure is applicable to White Plains, defendant contends that plaintiff is entitled only to $271.91 (one-half of $543.81). This contention is persuasive not only because of the impressive credibility of the defendant’s witness who had made the audit, but because of plaintiff’s failure to buttress its proof by documentary information or corroborative testimony. Thus there is no reasonable basis for allowing recovery on this item in excess of the verified amount.
Item, 2: Bond and Insurance Premium. Plaintiff’s witness testified that the company purchased a performance bond in accordance with the requirements of the contract, the premium payment for which was $132.97, $66.90 of which is applicable to WThite Plains. This amount was verified by the defendant and is concededly due plaintiff.
Plaintiff also claimed expenditure for $39.00 for a premium payment for certain Workmen’s Compensation insurance. For lack of verification or corroboration, this claim must be disallowed.
Item 3: Poles, fencing, reinforcing and structured steel. Plaintiff claims $569.45 for these items, of which defendant’s accountant was able to verify only $316.48.
One of the items which defendant was unable to verify was a claim of $160.00 (applicable to White Plains only) for 230 pieces of structural steel, including cost of bending and forming. The witness Robbins, without contradiction, identified the specific categories of steel purchased for the job. He testified further, without contradiction, that steel at the time cost 7 or 8 cents a pound, plus 2 cents a pound for bending and forming, and that the company purchased *829 1,600 pounds of steel for tbe White Plains job, resulting in an expenditure of approximately $160.00.
The plaintiff also claims $78.90 for structural steel and galvanized bolts. To support the claim, its witness testified that the company purchased small pieces of steel at a cost, including galvanizing, of $134.48. One-half of this expenditure (or $67.24), plaintiff asserts, is applicable to White Plains. Additionally, its witness testified that $6.66 was expended for special galvanized bolts, making a total of $73.90 for this particular item.
Though these claimed expenditures totaling $233.90 ($160.00 plus $73.90) for reinforcing and structural steel are unverified, the record does contain some independent corroboration. Specifically, on July 10, 1952, the C.A.A. wrote Dale (see finding 12) that in excess of 200 pieces of reinforcing steel and straight bars had been located at the White Plains site. The conclusion is inescapable from this that Dale must have made at least a substantial part of the expenditure for the steel in question. In these circumstances, and in light of Robbins’ testimony which is credible, there is reasonable basis for allowing one-half of this claimed expenditure, or $116.95. Although this result is only proximate, the fact of damage has been clearly established and a reasonable basis of computation is afforded. Under these circumstances, lack of certainty as to the amount of damages does not preclude recovery. Reiss & Weinsier v. United States, 126 Ct. Cl. 713, 721 and case there cited; Needles v. United States, 101 Ct. Cl. 535, 619; F. H. McGraw v. United States, 131 Ct. Cl. 501, 510. Certainly the defendant which “has violated (its contract should) not be permitted to reap advantage from (its) own wrong * * * (and) to escape liability because of the lack of a perfect measure of the damages caused by (its) breach.” Hoffer Oil Corp. v. Carpenter, 34 F. 2d 589, 592.
In summary, for Item 3, plaintiff is entitled to recover $316.48 (the amount verified), plus $116.95, or a total of $433.43.
Item J¡.: Electrical materials. The parties have stipulated that the plaintiff made expenditure of $695.52 for electrical materials.
*830 Item 5: Overhead costs. Plaintiff claims overhead costs of $900.00. In this connection Robbins testified, though again without presenting supporting documentary evidence, that this consisted of the following:
Direct office costs, postage, light, rent, etc._ $80.00
Est. office time 90 hrs. at 3.00_ 270.00
Est. — supervisory time-purchasing — 40 hours at 3.00_ 120. 00
Est. — engineering time-scheduling — 40 hours at 3.50 - 140.00
Est. — supervising shipping — 10 hours at 3.50_ 35.00
Est. cost of trucking and shipping & labor loading & unloading — 70 hours at 2.50_ 175. 00
Truck costs_ 80.00
$900.00
None of these claims could be verified and defendant contends that this claim should be denied. However, defendant’s witness readily agreed under cross-examination that plaintiff had overhead costs; that its personnel had to check, buy and ship materials; that expenditures for trucking, shipping and unloading materials were incurred; and that there were some office costs, though plaintiff’s office was apparently at the time in question in the Robbins’ home.
In addition, defendant’s audit of plaintiff’s costs on the Teterboro project reflected “procurement costs” of $900.00. This is relevant here since the work to be undertaken at Teterboro was virtually identical with that to be done at White Plains and since work on the two projects was to be performed during the same period of time. Withal, it is not realistic to assume that at the time of breach the plaintiff had incurred the same measure of overhead costs on the White Plains work as on the completed Teterboro project. Hence, plaintiff’s claim for $900.00 appears to be somewhat overstated. It is concluded rather that a reasonable allowance for overhead on the White Plains project is $450.00.
Item 6: Storage charges. Plaintiff claims $300.00 for storing materials. In this connection the witness Robbins testified that the materials were, for a period of 5 years, stored first in a garage in Boston, then in a yard at Randolph, Massachusetts, at a storage charge of $5.00 per month. Defendant was able to verify $35.00 of this claim on the basis of 5 rent receipts for $7.00 each covering a period in 1952.
*831 Robbins’ testimony as to the duration of the storage is credible. Apart from that there is the further consideration that an independent report of an C.A.A. engineer showed that on February 24, 1958, the materials in question were, in fact, stored virtually intact in three sheds in Randolph. (See finding 16.) The inference thus appears clear that the plaintiff had the materials stored continuously for a period of about 5 years. It stands to reason, too, that plaintiff paid storage charges during this period and a $5.00 per month payment therefor does not appear unreasonable. For these reasons, plaintiff’s claim of $300.00 for storage should be allowed.
Item 7: Cost of preparing administrative claim. Plaintiff seeks recovery of $456.00 for attorney’s and accountant’s fees, secretaries’ expenses, and other costs incurred in presenting its claim to the C.A.A. Expenses such as these— not connected with the performance of the contract — are not compensable. Ramsey v. United States, 121 Ct. Cl. 426. When the contract was breached by the defendant, plaintiff had the right to sue here for damages. Instead, it elected to seek an administrative settlement. Its expenses therefor were at its own volition for which the defendant is not responsible. Miller v. United States, 135 Ct. Cl. 1, 12. See also Vitarelli v. United States, 150 Ct. Cl. 59, 67, 279 F. 2d 878, 883 (1960).
Item 8: Stand-by costs for two employees. The witness Robbins testified that during the period from about June 18, 1951, to specified dates in the latter part of July 1951, plaintiff paid two employees the sum of $795.16, part of which is claimed to have been for stand-by time in respect of the White Plains project. Defendant’s audit showed that the payments to these two men during the period in question actually amounted to $893.97. Robbins further estimated that only 35 per cent of the time of these men was spent on productive work for Dale, and that the balance consisted of stand-by time for White Plains and therefore recoverable. This testimony is convincing and on the basis *832 thereof, plaintiff should be allowed $581.08 ($893.97 x 65%) for stand-by costs.[2]
Item 9: Loss of profits. Plaintiff employed two methods to establish loss of anticipated profits. First, it estimated the total job cost in performing the contract at $6,932.00, which subtracted from the contract price of $8,856.00, yielded an amount of $1,924.00 which plaintiff claims as profit loss. There are, however, several difficulties with this method. For one thing, none of the elements making up this estimated cost could, with a single exception not here material, be verified. For another, plaintiff’s schedule embodying these asserted costs was prepared not at the túne of the original bid submission but prior to trial. It is thus evident that in the circumstances of this case this method of computing profit loss has little, if any, probative value.
The second method employed by the plaintiff consisted of making a detailed cost breakdown of the Teterboro job, obtaining a profit rate therefor, and applying that rate to the $8,856.00 contract price of the White Plains project. In view of the similarity of the two projects, together with the fact that work on both was to be undertaken at the same time, this alternative method is a reasonable one for computing loss of anticipated profits.
Defendant’s audit of plaintiff’s records for Teterboro showed a total job cost of $8,262.67. Subtracting this from $9,474.09 (the final contract price of $9,512.09 less $38.00 paid by the C.A.A. for repair of damage to a telephone cable) leaves a difference of $1,211.42 — which was the profit on Teterboro. This amounted to a profit rate of 12.8%. Applying this profit rate of 12.8% to the White Plains contract price of $8,856.00 results in anticipated profit of *833 $1,133-57 to which plaintiff is entitled — -and defendant so concedes.[3]
Plaintiff is therefore entitled to recover and judgment is entered for plaintiff in the sum of three thousand nine hundred thirty-two dollars and forty-one cents ($3,932.41).
FINDINGS OF FACT
J. The plaintiff, Dale Construction Co. (Dale), is a corporation duly organized in 1950 under the laws of the Commonwealth of Massachusetts.
2. On November 29, 1950, competitive bids were received by the United States Department of Commerce, Civil Aeronautics Administration, First Region, Jamaica, New York (C.A.A.) on Proposal No. 151-816B1 for replacement of portions of Instrument Landing Systems at a number of specified locations. Dale was low bidder on Schedules VII and VIII covering two of the locations; i.e. Teterboro Air Terminal, Teterboro, New Jersey, and Westchester County Airport, White Plains, New York. On the Teterboro project covered by Schedule VII, Dale’s bid was in the estimated amount of $8,872.50; on the White Plains project covered by Schedule VIII, its bid was in the estimated amount of $8,856.00.
3. On December 20, 1950, a contract (No. Clca-10140) was fully executed between the C.A.A. and Dale for Schedules VII and VIII at a total estimated amount of $17,728.50. Required payment and performance bonds were furnished by the Seabord Surety Co., a New York insurance corporation.
4. The contract provided, among other things, that Notice to Proceed on both schedules would be issued to become effective approximately April 1, 1951; that time of performance was 45 days, after which $30.00 per day liquidated damages would be assessed for each day of delay in the completion of each schedule; and that if a contractor were *834 awarded more than one schedule having the same Notice to Proceed, the Notice would be effective 10 days after the preceding Notice, if the contractor so requested. The contract also provided that the contractor was to be responsible for all materials delivered and work performed until completion and final acceptance.
5. Dale wrote to the C.A.A. on March 20, 1951, requesting that the Notices to Proceed be staggered ten days. It advised that it “had ordered material for the jobs and pending starting and becoming acquainted with the site have instructed supplier to ship materials c/o Insac (Interstate Airways Communication Station) at the respective airports.” Further, Dale notified the C.A.A. that it “assume(d) responsibility for these materials * * *” The C.A.A. replied on March 27, 1951, that it did not maintain Insac facilities at either Teterboro or White Plains and that it did not have personnel to receive Dale’s materials.
6. On April 9, 1951, Dale received Notice to Proceed on Schedule VII, Teterboro. Work on that project was completed and the job was accepted on June 20, 1951 by the C.A.A. within the contract time. No question or claim has arisen from Schedule VII Teterboro that is before this court.
7. The nature of the work to be performed under Schedules VII and VIII was almost identical. However, due to change orders for certain revisions the contract price on the Teterboro project was increased from $8,872.50 to $9,512.09.
8. No Notice to Proceed on Schedule VIII was ever issued by the C.A.A.
9. On May 10, 1951, Dale wrote to the C.A.A. asking advice as to when it might expect a “Proceed Order” on its contract for the White Plains project. The company stated that “(w)e have all the necessary materials and personnel to start this job at once and await only a go-ahead signal from your office.”
The O.A.A. replied on June 11,1951, that it had originally planned to have the work at White Plains and Teterboro performed concurrently, but that the State of New York, to accommodate the Air National Guard, was extending the *835 runway, with the probable result of requiring changes in the work. The C.A. A. letter also stated:
We cannot now definitely ascertain whether we will be able to modify the existing contract to accommodate the new design and negotiate the necessary changes with your company. We, however, have been assured that definite plans will be in our hands within sufficient time to permit us to proceed with this new work shortly after July 1,1951.
If the nature of the revised work is such that we may legally accomplish same through a revision of the existing contract, and it is otherwise practicable to do so, you may expect to receive revised plans from us shortly after July 1, 1951, upon which you may submit new quotations. Should it not be legally possible for us to equalize the existing contract, or should it otherwise appear impracticable for us to do so, it will be necessary to issue a new invitation to bid and delete Schedule VIII from the existing contract.
We would appreciate your bearing with us until our plans may be formalized.
10. Not until March 21, 1952 — over nine months later— did Dale receive further written communication from the C.A.A. concerning the White Plains project. On that date, the C.A.A. notified Dale that it “now appears in the best interests of the Government not to have this work done” and that, therefore, “we are considering Contract No. Clca-10140 completed as of June 20,1951.”
11. No actual work on the White Plains site had been done as the C.A.A. had refused to issue the required Notice to Proceed. However, certain materials had been delivered to the site and personnel of Dale had gone to the site to become acquainted with the physical layout and requirements.
12. On April 28, 1952, the C.A.A. sent Dale a proposed release for all claims. Dale replied on the next day that it could not sign the release as it had a claim of $3,058.98 for specified direct and overhead costs incurred in connection with the White Plains project. The company further stated that it had invoices and other supporting data for the claimed material costs, copies of which could be sent to the C.A.A. if required.
*836 The C.A.A. acknowledged receipt of this letter on May 2, 1952, and on May 27, 1952 wrote Dale that it needed additional information before the claim could be considered. The C. A.A. letter also stated in part:
Personnel of this Administration have been at White Plains, but have thus far located only the penta treated poles which you mention in your letter. We would therefore appreciate your advice as to who has or had custody of the other materials and where they may now be found. This applies to the forms, pole steps, fence and frame, reinforcing and structural steel, and electrical materials. As to the electrical materials, we will need a breakdown on just what was delivered to your shop and what was delivered to White Plains. As to all materials, we will need a further breakdown on how you arrive at the amounts claimed. If possible, this should be substantiated by invoices or other documentary evidence. Furthermore, as to the electrical materials that were sent to your shop, we reserve the right to have them delivered as per our order if the Government pays for them and as to all materials, we believe that if the Government pays for them, a bill of sale or other satisfactory evidence of title should be supplied to the Government.
On July 10, 1952, the C.A.A. notified Dale that certain additional materials had been found at the project site and that it was providing this information to assist the company in substantiating its claim.
Not having received a response to its May and July 1952 letters, the C.A.A. wrote to Dale on November 6, 1952 that it would consider the matter closed unless the necessary information was supplied. On February 3,1953, Dale advised the C.A.A. that it would shortly supply the requested data. Dale wrote the C.A.A. on September 30, 1953 inquiring as to its claim. The C.A.A. replied on October 12, 1954, that it was still prepared to consider the claim but required the necessary information before it could do so. Finally on March 14, 1955, the O.A.A. notified Dale that since it had not provided necessary information, the agency would consider the claim abandoned unless the necessary proof was presented by April 30,1955.
13. On May 31, 1955, Dale submitted a 12-page sworn statement of claim in the amount of $3,040.67 for direct *837 costs for labor and materials and for certain overhead costs. The statement contained a detailed breakdown of purchases, list of materials, and suppliers, but was not accompanied by supporting documentary data. Dale stated that the amount claimed was for purpose of settlement, but that in the event the claim were not honored and suit became necessary, additional costs and expenses resulting from the contract cancellation would be sought.
14. Subsequent efforts to resolve the dispute by administrative settlement were unsuccessful.
15. Certain materials, including the forms for concrete, reinforcing steel, and poles, were delivered to the job site at White Plains. The plaintiff is unable to state what eventually happened to these materials after the defendant terminated the contract.
,16. Certain other materials, such as electrical materials, wire for fencing, and some steel, were stored by Dale in rented space — first in Boston, later at Eandolph, Massachusetts. On February 7,1956, the C.A.A. suggested that plaintiff meet with a C.A.A. engineer to make a joint visual inspection of these materials. On February 24, 1956, the C.A.A. engineer reported that visual inspection showed that the majority of certain listed items were still in storage in three sheds in Eandolph, Massachusetts. Since then, most of these materials were stolen.
17. Dale was ready and willing to turn the materials in storage over to the C.A.A. However, the C.A.A. required Dale to furnish documentary proof of the costs of these materials if it were to pay for them. It also notified Dale that if it did pay for the materials, it reserved the right to have them delivered to it as per its order. The record does not indicate that Dale at any time submitted to the C.A.A. supporting documentary proof of the costs of the materials.
18. Dale made no effort to sell commercially the materials it had acquired for the White Plains project.
19. The plaintiff seeks damages of $6,226.64 due to defendant’s cancellation of the portion of the contract relating to the Westchester County Airport. Defendant says that plaintiff is entitled to damages not in excess of $2,797.63.
*838 20. The evidence before the court establishes that the plaintiff is entitled to the following damages as a result of defendant’s breach of contract:
1. Item 1. Lumber, labor and miscellaneous materials- $271.91
2. Item 2. Bond_ 66. 90
3. Item 3. Poles, fencing, reinforcing and structural steel— 433.43
4. Item 4. Electrical materials- 695. 52
5. Item 5. Overhead costs_ 450.00
6. Item 6. Storage_ 300. 00
7. Item 8. Stand-by costs for two employees- 581.08
8. Item 9. Loss of profits-1,133.57
Total_$3, 932.41
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States three thousand nine hundred thirty-two dollars and forty-one cents ($3,932.41).

 The only witnesses who testified at the trial were Robbins, his wlfei, and an accountant of the defendant who had audited Dale’s boohs and records.

 At one point in the record Robbins testified that “at least as a minimum 35 percent of (their) time was wasted.” Defendant asserts that this testimony demonstrates that only 35 percent of the time of these men, rather than 65 percent, was on a stand-by basis. However, in the context of the entire testimony of the witness on this point, it would appear that the figure in the quoted excerpt was either a typographical error or a slip of the tongue, I am persuaded that at no time did the witness intend to amend his previous testimony that 65 per cent of the time of the two men was unproductive.

 Plaintiff asserts that it is entitled, in addition, to an amount computed on a learning curre on the ground that the experience it gained at Teterboro would result in greater efficiency and reduced cost at White Plains. This factor has not been allowed since there was complete absence of proof as to what extent and what amount the learning curre would hare affected plaintiff’s costs on the White Plains job.