Roy C. RASH

v.

The UNITED STATES.

No. 389–62.

United States Court of Claims.

May 13, 1966.

Carlos Castillon, Laredo, Tex., attorney of record, and George P. Kazen, Laredo, Tex., for plaintiff. Mann, Castillon & Freed, Laredo, Tex., of counsel.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

## OPINION

PER CURIAM:

This case was referred pursuant to Rule 45 (now Rule 57), and the order of remand dated October 30, 1964, to Trial Commissioner Mastin G. White, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed August 6, 1965. Exceptions were filed by the defendant and the case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion and recommendation of the commissioner, with a modification, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is therefore entitled to recover and judgment is entered for plaintiff in the amount of $89,285.80, which judgment is contingent upon prompt action by the plaintiff in surrendering to the defendant the possession of the property comprising the former Zapata Air Force Station, and in reconveying to the defendant the property which the defendant conveyed to the plaintiff by the deeds dated September 27, 1961.

Commissioner White's opinion, as modified by the court, is as follows:

This case grew out of a contract for the sale by the defendant and the purchase by the plaintiff of realty situated in Southwest Texas that had been declared to be surplus property.

The events leading up to the litigation began in the spring of 1957, when the defendant, with the intention of establishing and maintaining an Air Force radar installation, acquired from Eduardo Villarreal et al. two contiguous tracts of unimproved pasture land located within the exterior boundary lines of the Eduardo Villarreal Ranch in Zapata County, Texas. The lands were acquired by means of condemnation proceedings designated as Civil Action No. 764 in the United States District Court for the Southern District of Texas, Laredo Division. Declarations of taking with respect to the two tracts of land were executed by the Secretary of the Air Force and filed during the course of the condemnation proceedings, and judgments vesting the ownership of the lands in the United States were entered by the court. The United States also acquired by condemnation easements over other nearby lands for waterlines, sewerlines, and access roads.

The two tracts of land mentioned in the preceding paragraph were dissimilar in size, but each was rectangular in shape. The dimensions of the larger tract, designated in the condemnation proceedings as Tract No. A–100, were 1,320 feet by 990 feet, and it contained 30 acres. The dimensions of the smaller tract, designated in the condemnation proceedings as Tract No. A–100–1, were 1,000 feet by 490 feet, and this tract contained approximately 11.25 acres. The two tracts adjoined each other for a distance of 490 feet along the north boundary line of the smaller tract and the south boundary line of the larger tract.

The two tracts of land previously referred to were, after their acquisition by the defendant, surrounded by pasture land owned by Eduardo Villarreal et al. and comprising the remainder of the Eduardo Villarreal Ranch.

After acquiring the lands previously referred to, the defendant went inside the exterior boundary lines of the Eduardo Villarreal Ranch, took possession of two contiguous parcels of land located there, built a fence around the area, and constructed a radar installation upon the area. These two parcels of land had

the same shape, size, and dimensions, and a similar relationship to each other, as the two tracts of land that had been acquired by the defendant from Eduardo Villarreal et al.

On the larger of the two parcels of land forming the site of the radar installation, the defendant erected headquarters buildings, a school building, a recreation building, barracks buildings to house enlisted men, a building to house bachelor officers, a dining hall and kitchen, and a water system to serve not only the larger parcel but the smaller parcel as well. On the smaller parcel of land, the defendant erected 27 single-family dwellings. Waterlines, sewerlines, powerlines, and access roads were constructed over nearby lands to serve the radar installation.

In constructing the radar installation, the defendant intended to locate it on the two tracts of land which had been acquired from Eduardo Villarreal et al. By mistake, however, the defendant utilized as the site for the radar installation only about 7 acres in the northwest corner of the larger tract of land previously acquired from Eduardo Villarreal et al.,[1] and did not use for this purpose any portion of the smaller tract of land previously acquired from Eduardo Villarreal et al. Except for the 7 acres mentioned in the preceding sentence, the radar installation was inadvertently constructed by the defendant upon lands which were still owned by Eduardo Villarreal et al. and in which the defendant had no proprietary interest. This was not known at the time by either the defendant or Eduardo Villarreal et al.

The radar installation was operated by the defendant, through the Department of the Air Force, for a few years. It was known as the Zapata Air Force Station.

Sometime prior to May 4, 1961, the Department of the Air Force reported to the General Services Administration that the Zapata Air Force Station was excess to the needs of the Air Force. Thereafter, the Zapata Air Force Station was determined to be surplus property, and a decision was made that this installation would be offered for sale to the public on the basis of competitive bidding.

Beginning on or about May 4, 1961, the surplus property was publicly advertised for sale by the General Services Administration. The advertisement announced that the property would be sold at an auction to be held in the Zapata County Court House on June 19, 1961. In describing the property to be sold, the advertisement identified it as Government-owned surplus property that had been acquired by condemnation in Civil Action No. 764 in the United States District Court for the Southern District of Texas, Laredo Division, and in another action relating to the acquisition of certain easements. In addition, the advertisement contained metes and bounds descriptions of tracts of land designated as Tracts Nos. A–100 and A–100–1, the language used being identical (except for a few minor variations) with that used to describe Tracts Nos. A–100 and A–100–1 by metes and bounds in the declarations of taking and judgments thereon in Civil Action No. 764. However, the advertisement referred to the lands as containing "27 Three and Four Bedroom Houses and Large Administrative Buildings." Photographs of a headquarters building, a recreation building, two barracks buildings, a BOQ, and several residences were shown.

In accordance with the advertisement of sale, a public auction was held on June 19, 1961. The property was offered for sale as two separate items. Item 1 consisted of Tract No. A–100, together with certain appurtenant easements. Item 2 consisted of Tract No. A–100–1, together with certain appurtenant easements. In

1. The southeast portion of the larger parcel of land on which the radar installation was constructed and the northwest portion of the larger tract which the defendant had acquired from Eduardo Villarreal et al. overlapped to the extent of about 7 acres.

spirited bidding, the plaintiff submitted the highest bid for each item, and his bids were accepted. The plaintiff's bid for item 1 was $103,100, of which the sum of $20,620 was to be paid in cash and the remainder of $82,480 was to be paid in 40 quarter-annual installments, together with interest at the rate of 5¾ percent per annum. The plaintiff's bid for item 2 was $116,000, of which the sum of $23,200 was to be paid in cash and the remainder of $92,800 was to be paid in 40 quarter-annual installments, together with interest at the rate of 5¾ percent per annum.

Pursuant to the contract between the defendant and the plaintiff, the latter paid the former a total of $43,820 in cash, and he executed in favor of the defendant two promissory notes in the respective amounts of $82,480 and $92,800. The defendant (acting through the Regional Commissioner, Region 7, General Services Administration) executed deeds, without warranty, in favor of the plaintiff. The defendant retained vendor's liens to secure the payment of the promissory notes executed by the plaintiff in connection with the transaction. With respect to the two principal parcels of land, the deeds identified these parcels as Tracts Nos. A–100 and A–100–1, respectively, that had been acquired by condemnation in Civil Action No. 764; and the metes-and-bounds descriptions of the two parcels in the deeds were phrased in language identical (except for a few minor variations) with that used in the declarations of taking and judgment thereon relative to Tracts Nos. A–100 and A–100–1 in Civil Action No. 764. The deeds were tendered to and accepted by the plaintiff.

The plaintiff took possession of the former Zapata Air Force Station under his contract with the United States. In acquiring the property, it was the plaintiff's intention to sell it, but he intended to hold it for at least 6 months because of tax considerations. While awaiting developments in connection with the ultimate disposition of the property, the plaintiff rented some of the single-family dwellings to other persons.

An active campaign to sell the former Zapata Air Force Station was undertaken by the plaintiff in the early part of 1962. The initial effort was to sell the entire property as a single unit. This effort was not successful, however, so the plaintiff decided in March 1962 that it was not feasible to dispose of the former Zapata Air Force Station as a single unit, and that it was advisable to sell the 27 single-family dwellings as individual units. Various steps which are detailed in the findings of fact were undertaken by the plaintiff in order to get ready for such a disposition of these properties.

In the meantime, Eduardo Villarreal was dissatisfied with the amounts that the United States had paid into the registry of the court in connection with the condemnation proceedings and declarations of taking mentioned at the outset of this opinion. In an effort to bolster his belief that the damages which he had sustained were greater than the amounts previously paid into the registry of the court, Mr. Villarreal employed a competent surveyor and appraiser to make a survey of the property comprising the former Zapata Air Force Station. As a result of this survey, it was discovered for the first time that the defendant had constructed the radar installation largely on lands which were owned by Eduardo Villarreal et al. and in which the defendant had no proprietary interest. Mr. Villarreal promptly passed this information on to the defendant and to the plaintiff. Upon receiving such information, the plaintiff suspended any further efforts to dispose of portions of the former Zapata Air Force Station.

At that point in the sequence of events, the defendant was not chargeable with any breach of contract. Under the language of the documents constituting the contract between the defendant and the plaintiff, the defendant had contracted to sell and the plaintiff had contracted to buy the realty that had been acquired by the United States from Eduardo Villar-

real et al. through the 1957 condemnation proceedings. The deeds which the defendant had executed and delivered to the plaintiff covered precisely the property interests referred to in the contract. Thus, the defendant had performed in accordance with the letter of the contract between the parties.

 The trouble was that the language of the contract did not accurately reflect the intention of the parties. The defendant really intended to sell, and the plaintiff really intended to buy, the realty comprising the former Zapata Air Force Station. That realty was not the same as the realty covered by the language of the contract between the parties, except that the two areas overlapped to the extent of approximately 7 acres. Thus, the situation in which the defendant and the plaintiff found themselves provided a good illustration of a mutual mistake by two contracting parties concerning a material fact. The plaintiff was the party disadvantaged by the mistake, because he had received less than he intended to buy and the defendant intended to sell.[2] In such a situation, the injured party is generally entitled to secure a reformation of the contract in accordance with the intention of the parties, unless innocent persons will be affected by the change. 5 Williston, Contracts § 1547 (Rev.Ed.1937); Restatement, Contracts § 504 (1932). It is also the general rule that where reformation is possible, it is the only remedy permissible, since the mistake of the parties related to their expression only, and a rescission of the contract would be an unnecessary violation of their intent. 5 Williston, Contracts § 1557 (Rev. Ed.1937).

However, in May 1962, when the mutual mistake of fact in this case was discovered, it was not possible for the contract between the plaintiff and the defendant to be reformed so as to reflect the intention of the parties, because at that time the defendant did not own the realty which the parties had intended to include in the contract but which had been omitted from the language of the contract.

 Since the contract between the plaintiff and the defendant did not, because of a mutual mistake of fact, reflect the real intention of the parties, and since reformation of the contract so as to reflect such intention was not possible in May 1962, when the mutual mistake was discovered, the plaintiff at that time undoubtedly had the right to cancel the contract. However, the exercise of such right was dependent upon prompt action by the plaintiff to inform the defendant of the cancellation, and also upon prompt action by the plaintiff to restore the former status by surrendering possession of the former Zapata Air Force Station and conveying back to the defendant the realty which the defendant had previously conveyed to him. Grymes v. Sanders et al., 93 U.S. 55, 62, 23 L.Ed. 798 (1876).

After learning on or about May 25, 1962, of the mistake that had been made, the plaintiff promptly consulted his attorney. The plaintiff's attorney telephoned Arthur L. Moeller, of the Lands Division, Office of the United States Attorney for the Southern District of Texas, in Houston, Texas, and discussed the problem with him. Mr. Moeller indicated that he would send to plaintiff's counsel a written brief to the effect that the description in the plaintiff's deeds was sufficient to convey the former Zapata Air Force Station to the plaintiff, despite the results of the survey that had recently been made at the instigation of

---

2. The exculpatory provisions of the contract (relating to inspection, knowledge of conditions, sale "as is" and "where is", and title evidence and survey expense) did not place the risk of this mistake on the plaintiff. Here there was both a *positive misstatement* of the greatest significance by the defendant and "a case of ordering apples and getting oranges".

See United States v. Silverton, 200 F.2d 824, 828 (C.A.1, 1952); Standard Magnesium Corp. v. United States, 241 F.2d 677, 679 (C.A.10, 1957); Krupp v. Federal Housing Administration, 285 F.2d 833 (C.A.1, 1961); Varkell v. United States, 334 F.2d 653, 655, 167 Ct.Cl. 522, 525 (1964).

Mr. Villarreal. However, the promised brief was never sent to plaintiff's counsel.

A few days after the conversation between plaintiff's counsel and Mr. Moeller, plaintiff's counsel received a telephone call from William L. Bowers, Jr., Chief of the Lands Division, Office of the United States Attorney for the Southern District of Texas, in Houston, Texas, who said that he had taken over the handling of the case. Mr. Bowers further stated that a Government surveyor was being sent to Zapata, Texas, to conduct a new survey of the land in question, and that any further evaluation of the deed description would be made after the new survey was completed.

On June 6, 1962, plaintiff's counsel wrote a letter to the General Services Administration's regional office in Dallas, Texas, suggesting that the difficulty be resolved through negotiations between the defendant and Eduardo Villarreal et al., whereby the defendant would pay compensation for the portion of the Villarreal Ranch that had been mistakenly utilized for the former Zapata Air Force Station, and the ranch owners would convey such property to the plaintiff. The letter further stated that "Mr. Rash desires to avoid litigating this matter if possible, and at present desires relief from a situation which he did not bring about and over which he has no control." At this point, the plaintiff was seemingly interested in corrective action that would permit him to obtain a good title to the former Zapata Air Force Station and thus carry out the true intention of the parties.

In a letter dated June 21, 1962, and addressed to William L. Bowers, Jr., plaintiff's counsel asked that the defendant's dealings with Mr. Villarreal be expedited, because the uncertainty as to the correctness of the plaintiff's deeds made it impossible for him to complete a transaction which he had been negotiating relative to the property.

On June 28, 1962, plaintiff's counsel sent a letter to the Honorable Joe M. Kilgore, then a member of the United States House of Representatives from the 15th Congressional District of Texas. After explaining the plaintiff's predicament to Representative Kilgore, the letter stated that Mr. Rash "would like for General Services Administration to either now refund him his money, simultaneously with the reconveyance of the property by him to such administration, or to remove the cloud on his title, if such can be done promptly." After writing this letter, plaintiff's counsel learned that the defendant contemplated filing a motion to amend the declarations of taking in an attempt to correct the situation that had developed. Plaintiff's counsel believed that such a procedure would involve a long delay, so on June 29, 1962, he wrote a second letter to Representative Kilgore, stating that "Mr. Rash would like to rescind the sale rather than have a long delay in connection with clearing of title," and that "the only fair and equitable thing for the General Services Administration to do would be to promptly agree on a mutual rescission of this sale."

On July 2, 1962, Representative Kilgore forwarded to Bernard L. Boutin, Administrator of the General Services Administration, the communications dated June 28 and 29, 1962, from plaintiff's counsel, with a covering letter stating that "it would be appreciated if attention could be directed toward relief for Mr. Rash as soon as possible." Thus, the defendant was put on notice in early July of 1962 that the plaintiff was no longer interested in the reformation of the contract, because of the anticipated delay that would be involved in pursuing that course of action, and that the plaintiff was expressly requesting a mutual rescission of the contract.

Lawson B. Knott, Jr., Acting Administrator of the General Services Administration, wrote to Representative Kilgore on July 26, 1962, stating that "Mr. Rash has no legal claim against the Government for damages or for rescission of the sale," but that, as an assistance to Mr. Rash, the Government would attempt to amend the declarations of taking in order to clarify the description of the prop-

erty, and then deliver corrective deeds to Mr. Rash.

A copy of the letter mentioned in the preceding paragraph was transmitted to plaintiff's counsel. He wrote another letter to Representative Kilgore on July 31, 1962, expressing doubt that the declarations of taking could be amended, since the public purpose for which the tracts of land had been condemned no longer existed, and stating again that "the only fair thing for General Services Administration to do is to now agree to rescind the sale to Roy Rash." This letter was forwarded to the General Services Administration by Representative Kilgore.

Lawson B. Knott, Jr., wrote a further letter to Representative Kilgore on August 16, 1962, again expressing willingness to deliver corrective deeds to Mr. Rash promptly after the amendment of the declarations of taking, and stating that "this is as much as Mr. Rash can expect the Government to do."

The plaintiff personally wrote a letter to Lawson B. Knott, Jr., asking him to reconsider his position "and agree to promptly rescind this sale." Mr. Knott replied on August 29, 1962, stating that he was not in a position to grant the plaintiff's request.

On November 21, 1962, the defendant filed with the United States District Court for the Southern District of Texas a motion to amend the declarations of taking, so that the lands described therein would be the same as the lands upon which the former Zapata Air Force Station had been constructed. The defendant's motion was denied by the court on January 7, 1963.

The defendant undertook to make arrangements with Eduardo Villarreal et al. whereby the ownership of the lands on which the former Zapata Air Force Station had been constructed could be transferred to the plaintiff (except for the 7-acre parcel the ownership of which was already vested in the plaintiff). The arrangements with Eduardo Villarreal et al. essential to such a transaction were completed by the defendant on or about April 1, 1963. In May 1963, the defendant formally tendered to the plaintiff new deeds conveying to the plaintiff the lands, easements, and improvements comprising the former Zapata Air Force Station. One deed covered the 30-acre parcel of land containing the headquarters buildings, the school building, the recreation building, the barracks buildings, the BOQ, the dining hall and kitchen, and the water system, together with appurtenant easements; and the other deed covered the 11.25-acre parcel of land containing the 27 single-family dwellings, together with appurtenant easements. However, the plaintiff refused to accept these deeds, because the market value of the properties comprising the former Zapata Air Force Station had declined substantially during the period between May–June of 1962 and May of 1963.

Thus, it will be seen that when the mutual mistake of the parties was first discovered by the plaintiff, he indicated a desire to have the contract reformed so that it would express the true intention of the parties, if this could be accomplished with reasonable promptness. Then, when it was learned that the defendant proposed to effect the reformation of the contract by amending the declarations of taking and executing corrective deeds in favor of the plaintiff, the latter (acting through his counsel) immediately asked for a rescission of the contract, since it was believed that the proposed procedure would involve a long period of delay. The anticipation of delay was well-founded, and it ultimately developed that the attempt to amend the declarations of taking was unsuccessful.

At all times beginning with the early part of July 1962, the plaintiff, in his relations with the defendant, was consistent and insistent in urging that the contract be rescinded. In this connection, the defendant's various agencies involved in the transaction were aware that the plaintiff stood ready at all times to restore the status quo by surrendering possession of the former Zapata Air Force Station and reconveying to the defendant the property which the defendant had previously conveyed to him.

The criterion to apply is whether the plaintiff's delay in requesting rescission was unreasonable under the circumstances. 5 Williston, Contracts § 1594 (Rev.Ed.1937). It seems to me that the plaintiff is not chargeable with any undue delay in this respect. It is true that the plaintiff first learned of the mutual mistake of fact on or about May 25, 1962, and that the defendant was not informed of the plaintiff's desire to rescind the contract until on or about July 2, 1962. However, the purpose of this delay was to afford the defendant an opportunity to make with Eduardo Villarreal et al. arrangements whereby the plaintiff could obtain a good title to the property which he thought he was purchasing and which the defendant thought it was selling.

It is my view, therefore, that the defendant was under an obligation to grant the plaintiff's request for rescission when such request was received in the early part of July 1962, since the defendant at that time was not in a position to effect a reformation of the contract with reasonable promptness. Restatement, Contracts § 502 (1932).

The defendant's wrongful failure to discharge the obligation mentioned in the preceding paragraph caused damages to accrue to the plaintiff. Although the plaintiff remained in possession of the former Zapata Air Force Station (due to the refusal of the defendant to rescind the contract), rented to third persons single-family dwellings located on the property, and collected rental payments from such persons, the income derived by the plaintiff from the property was less than the expenses which the plaintiff incurred in connection with the property. The record shows that the plaintiff's total expenses in connection with the property —over and above the payments aggregating $70,583.07 which the plaintiff made to the defendant under the contract—exceeded the income that he received from the property by $28,571.64 as of February 11, 1965.

The net expenses of $28,571.64 referred to in the preceding paragraph included attorneys' fees amounting to $8,890.37 and travel expenses amounting to $978.54 incurred by the plaintiff in attempting to obtain administrative relief and in preparing for and conducting the present litigation. Since the plaintiff is not entitled to compensation for his expenses in attempting to obtain administrative relief (Dale Construction Co. v. United States, 161 Ct.Cl. 825, 831 (1963)), or for his expenses in preparing for and conducting the litigation (Mississippi Valley Generating Co. v. United States, 175 F.Supp. 505, 523, 147 Ct.Cl. 1, 32 (1959), reversed on other grounds 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268; Oliver-Finnie Co. v. United States, 279 F.2d 498, 505, 150 Ct.Cl. 189, 199 (1960)), the figure of $28,571.64 must be reduced by $8,890.37 and $978.54 to $18,702.73 in determining the amount which the plaintiff is entitled to recover. When the amount of $18,702.73 is added to the $70,583.07 representing the payments which the plaintiff made to the defendant under the contract, it appears that the plaintiff is entitled to recover a total of $89,285.80 in the present case.

The recovery by the plaintiff should, of course, be contingent upon prompt action by the plaintiff to restore to the defendant the possession of the property comprising the former Zapata Air Force Station, and the reconveyance by the plaintiff to the defendant of the property which the defendant conveyed to the plaintiff.