**William S. WOODY**

v.

**The UNITED STATES.**

**No. 355–82T.**

United States Claims Court.

Jan. 27, 1986.

Jack V. Place, Roanoke, Va., for plaintiff.

Charles Bricken, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant.

## OPINION

WOOD, Judge.

This action arises from a 1981 sale to plaintiff of the interest of Piedmont Development Corporation (Piedmont) in certain real property (the Property) previously seized by the Internal Revenue Service (the Service) pursuant to section 6331 of the Internal Revenue Code of 1954, as amended, 26 U.S.C. § 6331[1], for collection of a tax liability owed by Piedmont. Plaintiff seeks to recover $46,000, the sum he paid as a deposit against the purchase price of the property sold to him at the 1981 sale, plus interest, costs, and attorney fees.

The facts essential to disposition of the case have been stipulated or are otherwise properly established by documentary materials in the record, and both parties have moved for summary judgment. Upon consideration of the briefs and arguments of the parties, and for reasons to be stated, plaintiff's motion for summary judgment is denied, and defendant's motion is granted. The complaint will be dismissed pursuant to RUSCC 58.

## I

The factual roots of the case extend back to March 1977, when the Service assessed against Piedmont taxes in the amount of $197,028.17. Demand was duly made upon Piedmont for payment of such taxes, but Piedmont failed to pay them, and on July 1, 1977, a notice of federal tax lien against Piedmont in the amount of $197,028.17 was docketed in the Judgment Lien Docket of the Circuit Court of Pulaski, Virginia.

In the meantime, by deed recorded May 3, 1977, Piedmont had conveyed Tract One, one of the two parcels comprising the Property[2], to Russ L. Shannon and Joseph F. Hale, a partnership. Subsequently, by deed recorded July 11, 1978, Piedmont conveyed Tract Two to Mr. Shannon and Mr. Hale, a partnership. In the words of the stipulation of the parties, the 1978 deed "purports to correct an erroneous legal description of properties · conveyed in the [1977] deed * * *."

On June 26, 1981, in an action (brought by a creditor of Piedmont) seeking to have the deeds of the Property from Piedmont to the partnership declared void as fraudulent conveyances, the Circuit Court of Pulaski County, Virginia, entered a final decree. The decree reflected, *inter alia*, that the "conveyance" of the Property by Piedmont to Joseph F. Hale was not supported by "a consideration deemed valuable in law," and that a reconveyance of the Property by Russ L. Shannon to Piedmont made the question "whether the conveyance to him by Piedmont * * * was based on a consideration deemed valuable in law" moot.[3] The decree further ordered that "the conveyances to Joseph F. Hale" by the deeds recorded May 3, 1977, and July 11, 1978 (described above) were "nullified, voided, and set aside."

---

**1.** All statutory references herein are to the Internal Revenue Code of 1954 as in force during the relevant period. The Property was comprised of two parcels (Tract One and Tract Two), in Dublin, Pulaski County, Virginia; a 52 (or 54) unit apartment complex, commonly known as Williamsburg Estates, was constructed on the Property.

**2.** *See* note 1, *supra.* Piedmont had duly acquired title to the Property, through recordation of two separate deeds, in 1974.

**3.** By deed, dated June 6, 1981, Mr. Shannon had purported to reconvey to Piedmont "the entire interest in the above-described real property of Russ L. Shannon, said property having been owned by Russ L. Shannon and Joseph F. Hale as partnership property." The said deed was recorded July 2, 1981.

Some time prior to August 1, 1981, the Service gave timely public notice that the Property had "been seized for non-payment of internal revenue taxes due from Piedmont Development Corporation," and, in accordance with section 6335 and related regulations, would "be sold at public auction" August 6, 1981; the Service further indicated, however, that "Only the right, title, and interest of Piedmont Development Corporation in and to the property will be offered for sale." [4] Plaintiff read the published notice on or about August 1, 1981.

Plaintiff was present on August 6, 1981, at the time and place set for the sale described in the preceding paragraph. At the outset, a Revenue Officer read a prepared announcement concerning the sale. Among other things, the announcement included a description of the Property and its appurtenances, a statement that only the right, title, and interest of Piedmont in and to the Property would be offered for sale, and an explanation of the terms of sale. The Revenue Officer also read aloud a disclaimer of warranties contained in the posted notice.[5]

After the prepared announcement had been read, there was some discussion of certain requirements concerning assumption of a prior encumbrance on the Property. Thereafter, the Revenue Officer called for bids. Plaintiff offered to purchase Piedmont's interest in the Property for $230,000; that bid was the highest and best bid at the auction sale and was accepted by the Service. In conformity with the terms of the sale, plaintiff paid to the Service $46,000, or 20 percent of the purchase price, upon the acceptance of his bid.[6]

By letter, dated August 14, 1981, to the Service, plaintiff (through counsel) sought to rescind the sale and made claim upon the Service for refund of the $46,000 deposit he had made at the time of sale. The Service refused to make any refund to plaintiff, and he refused to pay to the Service any part of the balance ($184,000) of the purchase price for Piedmont's interest in the Property. In consequence, and in compliance with section 6335(e)(3), the Service declared the sale to plaintiff to be null and void, and resold Piedmont's interest in the Property at public auction.[7] This action followed.

## II

In broad terms, the question is whether or not plaintiff, the successful bidder at a tax lien foreclosure sale of an interest in real property conducted pursuant to sections 6331 and 6335, is entitled to a refund of the amount ($46,000) he paid to the Service, upon the acceptance of his bid, as a deposit toward the purchase price of the property sold to him. The issues to be faced in resolving that question can, however, be more narrowly stated.

Plaintiff rests his claim of right to refund on section 601.104, "Collection Functions," "Statement of Procedural Rules," Internal Revenue Service, 26 CFR § 601.-

---

**4.** A notice of the proposed sale was published in the Roanoke Times and World News, a newspaper of general circulation in Pulaski County, Virginia, and a "Notice of Public Auction Sale" (on IRS Form 2434) was posted at several locations in Pulaski County. Both forms of the notice contained the words quoted in the text. Both forms of the notice also referred to each of the conveyances, and the court decree, mentioned above.

**5.** The disclaimer provided in part that: "All property is offered for sale 'where is' and 'as is' and without recourse against the United States. No guaranty or warranty, express or implied, is made as to the validity of the title, quality, quantity, weight, size, or condition of any of the property, or its fitness for any use or purpose. No claim will be considered for allowance or

adjustment or for rescission of the sale based on failure of the property to conform with any expressed or implied representation." *See also* Section 301.6335–1(c)(4)(iii), Treasury Regulations on Procedure and Administration, 26 CFR § 301.6335–1(c)(4)(iii) (1982).

**6.** Under payment terms in both the published notice and the posted notices, the balance of the purchase price was to be due within seven days from the date of sale.

**7.** Plaintiff's deposit was retained by defendant and applied (1) to pay the expenses of sale and (2) to reduce Piedmont's tax deficiency. The retained deposit, and the amount defendant realized from the resale of Piedmont's interest in the Property, were slightly less than $230,000, plaintiff's bid price therefor.

104 (1982), providing in pertinent part as follows: [8]

(c) Enforcement procedure—

\*      \*      \*      \*      \*      \*

(2) *Levy.* If a taxpayer neglects or refuses to pay any tax within the period provided for its payment, it is lawful for the district director to make collection by levy on the taxpayer's property. See section 6331 of the Code. \* \* \*. If the Service sells property, and it is subsequently determined that the taxpayer had no interest in the property or that the purchaser was misled by the Service as to the value of the taxpayer's interest, immediate action will be taken to refund any money wrongfully collected if a claim is made and the pertinent facts are present. The mere fact that a taxpayer's interest in property turns out to be less valuable than the purchaser expected will not be regarded as giving the purchaser any claim against the Government.

Specifically, plaintiff contends (1) that Piedmont "had *no* interest in the property" (emphasis not supplied) sold to him at the August 6, 1981, sale; (2) alternatively, that he was "misled by the [Service] as to the value of \* \* \*" Piedmont's interest in the property; and (3) that he is in any event entitled to recover the $46,000 assertedly "wrongfully collected" from him on August 6, 1981.

A.  The contention that "the Service purported to sell the entire Property."

Plaintiff argues that he, and the Service, "presupposed that Piedmont's interest embraced the Property in its entirety and that \* \* \* the entire fifty-four (54) unit apartment complex \* \* \* was being offered for sale by the Service \* \* \*." Conceding that Piedmont "may have owned" a portion of the Property, he nonetheless argues that the Service intended to sell, and he intended to purchase, *all* of the Property, not simply part of it. The claim lacks any substance.

The published and posted notices of sale, the announcement made on August 6, 1981, and the statute (and implementing regulation) under which the August 6, 1981, sale was conducted, all make it abundantly plain that the Service was offering for sale only the right, title, and interest of Piedmont in and to the Property, with no representation, warranty, or guaranty, express or implied, as to what that right, title, and interest might be. *Pia v. United States,* 7 Cl.Ct. 208, 211 (1985); *see also Varkell v. United States,* 334 F.2d 653, 654–55 (Ct.Cl. 1964); *American Sanitary Rag Co. v. United States,* 142 Ct.Cl. 293, 161 F.Supp. 414 (1958); *Barstow Truck Parts & Equipment Co. v. United States,* 5 Cl.Ct. 224 (1984).[9]

Plaintiff points to nothing in the record to indicate that the Service was, or that at the time of the sale he could reasonably have been, of the view that any more than Piedmont's right, title, and interest in and to the Property, whatever that might be, was offered for sale.[10] Indeed, the record affirmatively and conclusively demonstrates the contrary. Plaintiff can derive

---

**8.** Section 601.101 "Introduction," "Subpart A—General Procedural Rules," 26 CFR § 601.101 (1982) provides in pertinent part that:

\*      \*      \*      \*      \*      \*

(b) *Scope.* This part sets forth the procedural rules of the Internal Revenue Service respecting all taxes administered by the Service, \* \*. Subpart A provides a descriptive statement of the general course and method by which the Service's functions are channeled and determined, insofar as such functions relate generally to the assessment, collection, and enforcement of internal revenue taxes. \* \* \*.

\*      \*      \*      \*      \*      \*

Section 601.104(c)(2), quoted in the text, is included in Subpart A.

**9.** All else aside, plaintiff's suggestion that he need not prove Piedmont had no interest in the Property to qualify for relief under section 601.-104(c)(2) founders on the language of that section.

**10.** Plaintiff does not, and could not successfully, deny that the published notice of sale made a full and accurate disclosure of all relevant conveyances, and of the 1981 court decree, affecting the Property; nor does he deny knowledge of the Service's disclaimers.

no comfort whatever from the argument that the Service purported to sell the entire Property.

B. The contention that Piedmont had no interest in the Property at the time the notice of tax lien was docketed.

Plaintiff also asserts that, on July 1, 1977, when the Service's notice of tax lien was docketed, Piedmont "had no interest in the Property * * * or, at best, had an interest in only Tract Two." In this connection, he suggests that the 1978 deed which purported to "correct an erroneous legal description of properties conveyed in the [1977] deed" to Mr. Shannon and Mr. Hale, a partnership,[11] vested in the partnership "title to the entire Property as of May 3, 1977, and prior to the docketing of the tax lien on July 1, 1977," and asserts that, if so, neither the 1978 deed from Mr. Shannon to Piedmont nor the 1978 final decree purporting to nullify the conveyances of the Property to Mr. Hale was effectual "to reinvest in Piedmont any title to any portion of the Property."

It is unnecessary to reach the latter portion of the argument. It is clear that, as defendant contends, its tax lien had priority over the 1978 deed to Tract Two, whether or not the parties to the 1977 deed (recorded prior to the recordation of the tax lien) intended to convey Tract Two with Tract One by the 1977 deed. See sections 6323(a), (f); *United States v. Creamer Industries, Inc.*, 349 F.2d 625 (5th Cir.), *cert. denied*, 382 U.S. 957, 86 S.Ct. 434, 15 L.Ed.2d 361 (1965); *United States v. Schuster*, 73–1 U.S.T.C. ¶ 9241 (N.D.Ohio, November 28, 1972).[12] This being so, it is unnecessary to explore by way of dictum the difficult issues surrounding the 1981 Shannon deed and court decree.

The result of the foregoing is that, on July 1, 1977, and on August 6, 1981, the taxpayer had at least some interest in the Property, and that plaintiff has therefore failed to establish that Piedmont had "no interest" in the Property at the time of the August 6, 1981, sale. He accordingly cannot satisfy the first of the two relief provisions in section 601.104(c)(2) on which he relies.

C. The contention that plaintiff was misled as to the value of Piedmont's interest in the Property.

Plaintiff finally contends that the published notice of sale misled him as to the value of Piedmont's interest in the Property. This is but another facet of the argument (heretofore discussed) that plaintiff understood that the sale would encompass the entire Property. It gains no merit from restatement in slightly different form. *See Pia*, 7 Cl.Ct. at 211, and cases there cited.

The published notice admittedly seen by plaintiff accurately stated that only Piedmont's interest in the Property would be sold. It referred, accurately and completely, to each of the several deeds affecting the Property, and to the 1981 decree concerning it. It referred to statute and implementing regulations, having the force and effect of law, providing in pertinent substance that the interest in the property being sold was not accompanied by any express or implied guaranty or warranty, and it was supplemented prior to sale by a verbal announcement which included the disclaimer of warranties contained on the posted notices of sale.

In these circumstances, the consequences of any failure by plaintiff to explore the

---

**11.** To reiterate, Piedmont conveyed Tract One to the partnership by deed recorded May 3, 1977; the notice of federal tax lien was docketed July 1, 1977, more than a year before the 1978 deed to the partnership purporting to correct the description of the property covered by the 1977 deed.

**12.** In *Creamer Industries, Inc.*, a federal tax lien was recorded after a deed erroneously omitting

property intended to be conveyed had been recorded, but before the execution of a deed of correction; the corrective deed was held insufficient to defeat the intervening tax lien. While that case was decided under Texas law, Virginia law is for present purposes substantially identical, and the result there reached is persuasive here.

value of the interest in the property being sold prior to submitting a bid therefor cannot properly be shifted to defendant by an argument that plaintiff was misled by a published notice. If plaintiff did not understand the situation, the fault is his, not defendant's.

Plaintiff's reliance on *Sandri v. United States,* 266 F.Supp. 139 (D.Mass.1967), *Rash v. United States,* 360 F.2d 940 (Ct.Cl. 1966), and *Krupp v. Federal Housing Administration,* 285 F.2d 833 (1st Cir.1961), is misplaced.

*Sandri* involved a Commonwealth of Massachusetts Department of Public Utilities common carrier certificate purportedly seized and sold by the Service at a tax lien sale pursuant to section 6335. After requesting but being denied permission by the State to have the certificate transferred to his name, the purchaser sought and was held entitled to restitution, on the ground that the parties had made a mutual mistake of law that the certificate was "property" subject to seizure (and therefore transferable at the sale), and that that mistake of law had induced the purchaser to pay for the certificate. *Id.* at 142.

The essence of the holding in *Sandri* was that because the certificate was not within the category of "property or rights to property" referred to in section 6331, the Service's attempted seizure was ineffective, and that it therefore "had nothing to transfer to plaintiff * * * pursuant to the auction sale." *Id.* Without questioning the view respecting unjust enrichment apparent from *Sandri, cf. Cleveland Chair Co. v. United States,* 557 F.2d 244, 246 (Ct.Cl. 1977), that holding is of no help to plaintiff on the very different facts of this case.

In *Rash,* the parties intended to contract for the sale and purchase of certain realty (a former Air Force station). Because of a mutual mistake concerning a material fact,

however, that "realty was not the same as the realty covered by the language of the contract between the parties, except that the two areas overlapped to the extent of approximately 7 acres"; and, reformation of the contract to reflect the intentions of the parties was impossible. *Rash,* 360 F.2d at 944. There was, in short, "both a positive misstatement of the greatest significance by the defendant and 'a case of ordering apples and getting oranges.'" *Rash,* 360 F.2d at 944, n. 2. That is not true here.

*Krupp* too involved a "positive misstatement" of fact, *Rash,* 360 F.2d at 944, n. 2; in *Krupp,* "the selling agency flatly misstated a positive known fact concerning the property (*i.e.,* the number of garage spaces available)," *Montreal Securities Inc. v. United States,* 165 Ct.Cl. 120, 329 F.2d 956, 958, n. 2, *cert. denied,* 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36 (1964). The absence of any factual misstatement or warranty respecting the Property by defendant, and the explicit and broad disclaimers here made, serve to distinguish this case from *Krupp.*

### III

Upon a careful consideration of all of the contentions (whether or not expressly noted hereinabove) advanced by both parties, it is concluded that on the basis of the material facts concerning which there is no genuine dispute, defendant is entitled to judgment as a matter of law.[13]

No costs.

---

**13.** The result reached herein obviates any need to explore or resolve possible problems respecting the relative priority and legal effect of the various Service regulations and procedural rules cited in this opinion.