**J. D. HEDIN CONSTRUCTION COMPANY, Inc.**

**v.**

**The UNITED STATES.**

**No. 121–60.**

United States Court of Claims.

March 17, 1972.

J. Roy Thompson, Jr., Washington, D. C., attorney of record, for plaintiff. Thomas H. McGrail and Thompson, McGrail & O'Donnell, Washington, D. C., of counsel.

Mary J. Turner, Washington D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant. Robert E. Tressel, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, COLLINS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on December 23, 1971, under the order of reference and Rule 134(h). By joint motion the parties requested an extension of time to January 31, 1972, to file a notice of intention to except. However, on January 25, 1972, defendant filed a notice that it did not intend to except to the report of the commissioner and on January 26, 1972, plaintiff filed a motion requesting that the court adopt the commissioner's report as the basis for its decision. Since the court agrees with the commissioner's

opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby grants plaintiff's motion and adopts the report as the basis for its judgment in this case without oral argument. It is therefore concluded that plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $614,088.23.

## OPINION OF COMMISSIONER

GAMER, Commissioner:

Plaintiff's right to proceed under a contract with the Veterans Administration for the performance of certain construction work at the Administration's hospital in Marion, Indiana, was terminated by the contracting officer in the midst of construction operations. Its appeal of such action under the pertinent contract clauses was heard by the agency's Construction Contract Appeals Board. Upon the Board's recommendation, the appeal was denied by the agency's Assistant Administrator for Construction, the official designated to make such decisions.

Plaintiff also took four other appeals to the Board with respect to additional contract disputes, some aspects of which related to the termination action. These disputes were, for the most part, resolved against plaintiff by the Board and the Assistant Administrator.

Contending that the termination was wrongful and constituted a breach of its contract, plaintiff filed its petition herein contesting such action, as well as the agency's disposition of the other four appeals.[1]

On the parties' motions for summary judgment, grounded on an enormous administrative record,[2] the court, on March 14, 1969, concluded that the termination was improper. 408 F.2d 424, 187 Ct.Cl. 45. The court held that the termination could not validly be based upon a contract "Termination for Default" clause authorizing a termination for the contractor's failure to prosecute the work with such diligence as would insure its completion within the time specified in the contract. This was so because, had plaintiff been granted an extension of time, to which the court held it was entitled (contrary to the agency determination), plaintiff would not, as of the termination date, have been behind time, or at least would not then have been behind to such a degree as would have warranted a default termination. This extension-of-time dispute involved a critical nationwide cement shortage which occurred shortly after construction operations commenced and which seriously affected plaintiff's progress.

The court further held that the agency had also erred in relying upon the "Inspection" clause of the contract as an additional basis for the termination. This clause gave the contracting officer the right to reject, and to require the contractor to correct, defective material and workmanship, and, if the contractor failed to so correct "at once," to terminate the contractor's right to proceed. The Board and the Assistant Administrator determined that, of the host of instances in controversy, each of 33 specified items of alleged defective workmanship or materials independently warranted the termination action, but the court concluded that the record failed to support any of them as justifying termination under the clause in question.

After the termination, plaintiff's surety agreed with the VA to complete the

---

1. The original petition, contesting only the termination action, was filed on April 8, 1960. Proceedings thereunder were, however, suspended for completion of the administrative proceedings with respect to the four other appeals. By a "Supplement" to its petition, filed June 27, 1963, plaintiff also contested these agency determinations. By its answer to such supplement, filed August 9, 1963, de-

fendant asserted a counterclaim based upon one of the agency decisions.

2. The Board opinion on the termination appeal alone amounted to 277 pages. The motions and briefs with respect to the five appeals which the parties submitted to the commissioner and the court exceed 1,250 pages.

project and employed another contractor, the James Stewart Corporation, for this purpose. By the time such completion was effected, there was an overrun of 518 days from the original contract completion date as extended, and plaintiff, being held responsible for such late completion because of its alleged default, was consequently assessed with liquidated damages in the amount of $155,400 ($300 per day) for the entire overrun. Such amount was withheld from moneys otherwise due plaintiff under the contract. The court held, however, that such assessment was unwarranted since the termination itself was improper.

Furthermore, after the termination the agency spent $8,769.33 to protect the work in its partially completed state, and considering this expense too as attributable to plaintiff's alleged default, the agency reimbursed itself therefor by similarly deducting such amount from the sums otherwise due plaintiff under the contract. The court again held, however, that its conclusion that the termination was improper necessitated invalidating this charge against plaintiff.[3]

Accordingly, the court held that (a) plaintiff was entitled to recover the two withholdings, totaling $164,169.33; and (b) the improper default-termination constituted a breach of contract for which plaintiff was entitled to recover such common law damages, including anticipated profits, as it would be able to prove in further proceedings before this court. In connection with such proof, the court stated that plaintiff would have to show the amount of excusable delay resulting from the cement shortage, whether plaintiff would have timely completed the project even with the additional time extension to which it was entitled, and the monetary damage, if any, which it suffered by reason of the termination, i. e., whether it was deprived of any profit it would have made had there been no termination, or, even if there would have been no such profit, whether its loss would have been less than it actually suffered by reason of the wrongful termination.

The issues relating to the damages led to further heated controversy. Extensive pretrial proceedings, a trial of over three weeks, and voluminous requested findings and briefs (totaling almost 400 pages) resulted. During the course of the proceedings, however, the parties were able to arrive at certain agreements. They stipulated that the cement shortage terminated on November 1, 1955; that the shortage delayed plaintiff's construction operations six months, or 180 days; and that, had plaintiff received the extension of time therefor to which it was entitled, such extension, together with those totaling 74 days which the agency had granted plaintiff for other reasons, would have extended the project completion date to March 8, 1957.

Plaintiff's petition alleges damages of $2,793,534.39, including the withheld liquidated damages and protection costs. As a result of the elimination of certain items which it has now abandoned,[4]

3. One of the additional agency appeals involved this matter. In sustaining the deduction, the agency, upon the basis of the appeal record, determined that the correct amount that should have been withheld was $9,009.50, an increase of $240.17. Since the agency at that time had no further contract funds against which to effect this additional withholding, defendant filed a counterclaim in such amount in this case. The court dismissed this counterclaim.

4. In its petition, plaintiff also claimed delay damages totaling over $275,000 growing out of five other breaches of the contract allegedly committed by defendant during the period of plaintiff's performance. The court held that, in the further proceedings, plaintiff would be entitled to pursue these breach claims and to recover any damages attributable thereto not duplicated by the damages for the improper default termination. However, plaintiff decided to abandon these claims.

The petition also sets forth a claim for $61,000 for fees and expenses in the proceedings before the agency Appeals Board, and a claim that as a result of the unlawful termination, plaintiff's business was destroyed and that, but for the termination, the business would have existed at

and adjustments in other items, plaintiff's total claim (including the two withholdings which the court has already held plaintiff is entitled to recover) is now in the amount of $1,121,549.01.

There will be discussed herein only the remaining substantive differences between the parties. The details of the computations of the various damage items flowing from the resolution of these differences are set forth in the findings of fact.

### Claim for Excess Completion Construction Costs

The pertinent provision of the contract under which plaintiff's right to proceed was terminated (Clause 5) provided that, in the event of such termination, "the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the Contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby, and for liquidated damages for delay * * * until such reasonable time as may be required for the final completion of the work * * *."

Defendant, instead of taking over the work itself and prosecuting it to completion, offered the surety the opportunity of completing it, provided that the contractor employed by the surety to perform the work would not be the plaintiff. After considering the problem, including the making of a survey, the surety decided that it would undertake such completion and entered into a cost-plus-a-fixed-fee contract with the James Stewart Corporation for this purpose, such contractor being satisfactory to defendant.

To obtain the issuance of the required payment and performance bonds, plaintiff agreed to indemnify the surety against any losses or expenses it incurred as a result of such issuance (Mr. J. D.

Hedin, owner and president of the plaintiff, was, personally, also an indemnitor).

Defendant accepted the project on February 10, 1958. The surety received from defendant the balance of the contract proceeds (less the liquidated damages and protective costs assessed against plaintiff), but the amount for which the surety was liable to Stewart under the cost-plus contract far exceeded such proceeds. The surety paid Stewart for part of such excess and, since plaintiff was liable to the surety under its indemnity agreement for all of such liability, plaintiff paid the balance of the excess directly to Stewart. In any event, plaintiff bears the brunt of all of such completion costs, whether paid by it or by the surety, since it remains liable to the surety for the surety-paid amounts.

The costs Stewart incurred in completing the items of construction which remained at termination totaled $1,267,929.02. Plaintiff contends that, had there been no termination, its own completion costs, calculated on the basis of its original bid estimate applied to the amount of work remaining to be accomplished, and on the basis of a completion date of June 1, 1957, would have been only $741,130.46. It thus maintains that the wrongful termination damaged it in the amount of over $525,000 in respect of such completion costs.

Defendant contends, however, that, for various reasons, plaintiff's completion costs would have been considerably higher than plaintiff's estimated figure of approximately $740,000. For one thing, it makes a strong attack on the estimates upon which plaintiff's successful bid for the project was based. It says these estimates were not only insufficient with respect to various items, but also improperly failed to include entire items of substantial cost (such as home office overhead) and to cover, or at least to cover adequately, such contingencies as

least ten more years, earning an average of $143,000 per year, resulting in loss of future earnings in the amount of

$1,430,000. Plaintiff has also abandoned these claims.

increases in labor rates and material prices. It argues, therefore, that plaintiff's cost to complete should not be computed upon the cost estimates contained in its bid. Further, defendant says that, based on the amount of work remaining to be accomplished as of the termination date (about which there is also a dispute) and the rate of progress plaintiff demonstrated it was able to achieve prior to the termination, plaintiff would not have been able to complete its work by June 1, 1957, as plaintiff contends, but instead would have attained completion over seven months later, *i. e.,* on January 11, 1958 (approximately one month before Stewart's completion). Remaining on the project that additional lengthy period would, defendant says, have necessarily resulted in heavy additional project costs (and, in view of the stipulation of the parties that plaintiff's time extensions would have extended the project completion date only to March 8, 1957, in a large assessment of liquidated damages). Defendant therefore argues that, insofar as completion costs are concerned, plaintiff would have fared no better than Stewart, a contractor of recognized competence. Indeed, plaintiff's costs would, defendant maintains, in fact have exceeded Stewart's costs by over $173,000. Accordingly, defendant concludes that plaintiff has, insofar as completion costs are concerned, in no way been damaged by the termination.

The record fails to support these contentions of the defendant and the conclusion flowing from them that plaintiff suffered no excess completion cost damage by reason of the termination. Indeed, it compels the conclusion that plaintiff in fact suffered substantial damages of this nature.

As to the amount of work remaining to be accomplished as of the termination date, plaintiff contends that at least 63 percent of the project work had been completed as of such date, leaving only 37 percent of the work to be accomplished. Defendant argues, however, that the percentage of completion at termination did not exceed 52 percent.

Official monthly progress reports were prepared by defendant's Resident Engineer. These reports set forth the successive monthly percentages of progress completion. Each report was prepared after a survey of the value of the work accomplished during the month, a review of daily logs, an analysis of subcontractor invoices of work accomplished, and discussions with the contractor's job supervisory personnel. Although the reports were dated as of the end of the month, the surveys were made and the reports prepared so as to reflect the status of project completion as of the 25th of the month. The contractor received copies of these reports and there is no indication that there was ever any disagreement between the parties concerning their accuracy. The last official monthly report made in accordance with the described procedure during plaintiff's performance of the contract was the report dated October 31, 1956, reflecting the state of the project as of October 25, 1956.

The percentage of completion reflected by the October monthly report was 56.2 percent. Plaintiff accepts this figure and attempts, by payroll and other project records (subcontractors' invoices), as well as by the testimony of the witnesses, to arrive at an appropriate figure representing the work accomplished between October 25, 1956 and the termination date of November 29, 1956. It thus arrives at the figure of 7.2 percent completion accomplished between such dates ($145,140.56) leading to its conclusion of at least 63 percent completion as of termination.

Defendant would, however, reject the official monthly progress reports in various respects and arrives, by reconstruction, at different monthly percentages of work accomplished. Furthermore, for the work performed between October 25 and November 29, 1956, defendant relies upon a report prepared after the termination (actually three different reports were subsequently prepared for such period). An internal report, it was not sent to plaintiff in the ordinary course

of business, never received any concurrence from plaintiff, and, in view of the contemporaneous payroll and other records, is patently unduly low, attributing only 1.6 percent completion to such period ($32,800). In addition, defendant shows insufficient justification for rejecting its own official monthly report estimates issued prior to such final period and which, up to the time the controversy arose, were accepted as accurate by both parties.

Accepting plaintiff's basic method of calculating the October 25–November 29, 1956 work, but making certain adjustments with respect to the amount of work performed by its subcontractors, it is concluded that 5.7 percent of the contract work was completed during such period ($113,908.50).[5] Thus, as of the termination date, plaintiff had attained 61.9 percent completion, leaving only 38.1 percent of the work to be accomplished.

Defendant's position is further weakened by its reliance on the projected January 1958 completion date, which the evidence demonstrates is wholly unrealistic. On the other hand, the record leaves no doubt concerning the reasonableness of plaintiff's contention that it could, and would, have attained such a state of completion by June 1, 1957, as to have warranted acceptance of the project on that date.

Under plaintiff's original construction progress chart, which depicted its proposed monthly progress for the expected approximately 16 months of construction time (from mid-February 1955 through June 1956), plaintiff was supposed to complete approximately 62 percent of the project during the latter part of November 1955. It was contemplated that at such 62 percent stage, the building would be enclosed prior to the onset of the winter months, the bulk of the remaining 38 percent of the construction consisting of interior and finishing work, and that the project would be completed by June 28, 1956, the completion date required by the contract. This proposed schedule of operations as portrayed on the chart, which was approved by defendant in March 1955, was reasonable.

As it turned out, as of the termination date of November 29, 1956, the project was, insofar as the construction sequence was concerned, at approximately the same point as the progress chart depicted for the latter part of November 1955, i. e., approximately 62 percent complete, with the building being substantially enclosed. Thus, as of the termination date, plaintiff was, although about a year behind time, at a point at which its progress chart reasonably indicated completion of the remaining 38 percent of the project by the following June.

Furthermore, although the contract required completion by June 28, and the progress chart indicated completion on such date, the evidence shows that projects of the kind here involved were customarily accepted as substantially complete when 95 to 98 percent of completion was attained. At such stage of completion the building can normally be occupied even though some minor corrective ("punch list") items are still to be accomplished. According to the progress chart, only eight percent of the work would remain to be accomplished in the last four months, four percent in the last three months, and two percent in the last two months (one percent per month).[6] On this basis the project could have been accepted as substantially complete as early as April 1, when only four percent of the work would remain. Certainly, a proposed June 1 completion date, when only one percent of the work would remain, is a conservative estimate.

Finally, prior to the controversy herein, both parties contemporaneously estimated that the project would be com-

5. Finding 16.

6. | Month | Percentage |
|---|---|
| March | 4 |
| April | 2 |
| May | 1 |
| June | 1 |

pleted by June 1, 1957. The October 1956 official report, the last one prior to termination, estimated the contract completion date as June 1, 1957, as did the seven monthly progress reports prior thereto.

The reasons defendant now tenders as the basis for its attempt to reject its own contemporaneous official records in this respect are unconvincing. For instance, defendant does not contend that it would not be possible for a competent contractor to attain completion of the remaining work by June 1, 1957. However, relying on what it considers was plaintiff's sorry rate of progress while it was on the job, it argues that the plaintiff contractor would not have been able to do so. Defendant points out that during the year preceding the termination (*i. e.*, the period after the ending of the cement shortage), plaintiff accomplished a monthly average of only approximately 3.2 percent of project completion. Projecting this rate to the amount of the uncompleted work as of the termination date (as calculated by defendant) would result in plaintiff's not completing the project until the end of 1957 or the early part of 1958. But the technique of employing the average rate of progress achieved prior to the termination as the basis for forecasting what the rate would be in the future is, in this instance, not acceptable. It fails to take into consideration what the obstacles were with which plaintiff was faced during the pretermination period, such as the delays resulting from the circumstance that the cement shortage, ending in November 1955, threw much of the cement work to be accomplished in the ensuing winter months, an unfavorable period for such work. The same problem arose with respect to the other outdoor work to be done in such period, the state of the project at that time being such that the entire superstructure remained to be constructed. Furthermore, during 1956, plaintiff encountered brickwork delays (a shortage of bricks and bricklayers). Additionally, it received a 44-day time extension because of delays caused by defendant in approving stone shop drawings and samples, these delays not only affecting plaintiff's stonework, but also its brickwork operations. The simplistic method of taking a pretermination average rate of progress and applying such rate to the work remaining to be accomplished, without analyzing the actual state of the work as of the termination date, the nature of the work remaining to be done, the conditions under which it would be performed, and whether past delays encountered by the contractor would be likely, considering the nature of the remaining work, to be repeated and to have a similar delaying effect, must be rejected.

As stated, the work remaining to be accomplished as of termination was principally interior and finishing work. A large part of it was to be performed by subcontractors. Plaintiff had most of the work to be accomplished by subcontractors appropriately covered by executed contracts. Defendant points to the fact that, as of the termination date, plaintiff was entering the winter months. But, unlike the previous year, the superstructure was now substantially complete and enclosed, and the remaining construction, consisting largely of interior work, would not be affected by adverse winter conditions. The record discloses no condition or event that occurred between the termination date and June 1, 1957, that, had plaintiff remained on the job, would have prevented the attainment by plaintiff of such a percentage of completion by June 1 as would warrant acceptance of the project as substantially complete as of such date.

Defendant points to the Stewart completion date of February 11, 1958, and sees no basis for concluding that plaintiff would have been able to perform better than, or even as well as, this contractor of recognized competence. However, there were many reasons for Stewart's being unable to achieve substantial completion until February 1958 which would not have been applicable to plaintiff. Stewart encountered all the problems incident to job startup on a project

that had been completely shut down for weeks. For almost two months, from November 29, 1956, the termination date, to January 24, 1957, when defendant turned over to Stewart all job materials and equipment on the site, thus putting Stewart in a position to commence operations, the job was at a standstill.[7] Stewart had to staff the project, assemble workmen, renegotiate subcontracts, order materials, coordinate activities, and otherwise organize the project. The first work that defendant ordered Stewart to perform was alleged "correction" or "punch list" work, resulting in little forward progress. Stewart had to renegotiate all the subcontracts, and not only encountered difficulty in some instances in persuading the subcontractors to return to the project, but also found it necessary to abide by their then current manufacturing and delivery capabilities. For instance, in accordance with revised performance schedules imposed by certain subcontractors, the shelving did not even arrive on the project until November 1957, and the ceramic veneer tile until January 1958. The VA monthly progress reports reflect that Stewart actually accomplished only one percent of the work during December 1957, and made no progress whatsoever in January 1958, reflecting its inability to obtain subcontractor performance. Plaintiff, however, had these subcontractors bound by valid contracts requiring performance in accordance with plaintiff's own scheduled contract requirements.

Another delay Stewart encountered resulted from the removal by defendant of the roof cant strips[8] during the period immediately after the termination when the project was in defendant's possession and control. The Resident Engineer considered these cants to be defective because of an alleged improper ratio of cement and because some of the concrete was frozen, it having been allegedly poured during temperatures below those specified in the specifications.[9] Such removal served to open up the roof to leakage, and because of the ensuing winter months and adverse weather, prevented their replacement until April 10, 1957. Until these roof cant strips were reinstalled, the required interior plastering work was impeded. Had plaintiff remained in possession and control, the matter would have been handled in a manner that would not have resulted in opening up the roof to leakage, thereby causing substantial delay to important interior operations.

Without reflecting in any manner upon Stewart as a competent contractor, nevertheless all of the above-mentioned factors dictate the rejection of Stewart's rate of performance and its inability to obtain acceptance of the project until February 11, 1958, as any kind of accurate guide as to what plaintiff's performance would have been. In this connection, it is pertinent to note that plaintiff too had an excellent reputation as a competent contractor capable of achieving timely project completion. In its many years of existence and successful accomplishment of a very large number of projects, this was the first upon which it was assessed with liquidated damages.

Furthermore, in view of the substantial record evidence establishing the soundness of plaintiff's bid and the estimates upon which it was based, defendant's attack upon the accuracy and sufficiency of the bid and, therefore, the ap-

---

7. After it completed the project, the surety, by Stewart, requested a time extension of 197 calendar days, in which it stated that it was not until February 2, 1957 that Stewart actually commenced operations, and then only on a limited basis.

8. A "cant" is a strip of sloping filler, composed of light cinder cement, placed between a parapet wall on the roof and the roof itself.

9. This item was one of the deficiencies upon which defendant based its termination. On review, the Appeals Board concluded that the charge concerning improper ratio of cement was not supported but that the allegation concerning frozen materials was. No such notice of the deficiency as was required by Clause 9 of the contract was, however, ever given to the contractor. Commissioner's opinion filed May 22, 1968, pp. 143–44.

plication of the estimated costs set forth therein to the uncompleted work had there been no termination, does not succeed. The bid was prepared by plaintiff's president, a successful contractor with fifty years of experience in the construction industry, and a staff of four estimators headed by a graduate engineer with extensive experience in construction operations who had served for ten years as plaintiff's chief estimator. In addition, to confirm its own estimate of required quantities of materials, an independent estimate thereof was obtained from an outside professional estimator. Plaintiff's past experience included the construction of other VA hospitals. The bid was largely computed on the basis of the unit costs of the various items to be performed by plaintiff itself (about 40 percent of the work), such costs taking into consideration potential increases in wage rates and material prices, and on the cost of subcontracts covering the work of the specialized trades. Quotations were solicited from numerous subcontractors, those to whom the contracts were awarded being selected after careful analysis. Plaintiff's bid of $1,989,000 was not out of line. The next higher bid exceeded plaintiff's by only $69,000, or less than 3½ percent, the next by only $85,000, or slightly over four percent, and the next by $141,000, or about seven percent. The highest bidders exceeded plaintiff's bid by only 10 to 11 percent.

Since the evidence leaves no doubt that plaintiff's bid was a sound one, it would be reasonable to apply the cost estimates therein to the balance of the work remaining as of the termination date as the basis of determining what plaintiff's

completion costs would have been had there been no termination.

■ On the basis of (a) the application of the costs estimated in plaintiff's bid estimate to the amount of work remaining to be accomplished as of the termination date, and (b) a June 1, 1957 completion date, the record establishes that, had there been no termination, plaintiff's completion costs would have amounted to $848,131.99.[10] This figure takes into consideration certain adjustments to the bid estimates representing unanticipated cost increases plaintiff would have incurred, principally due to its being required to remain on the project a year longer than originally estimated because of the events hereinabove described, the largest contributing factor being the cement shortage.[11]

As stated, Stewart's completion costs totaled $1,267,929.02, which amount was defrayed by the remaining contract proceeds, by plaintiff, and by the surety (plaintiff being liable to the surety for the surety payments). However, since, had there been no termination, plaintiff would have been able to complete the project at a cost of only $848,131.99, plaintiff incurred, or has become liable for, excess completion costs of $419,797.03.

Defendant once more relies upon Stewart's performance in contending that plaintiff would not have been able to complete the project any less expensively. But again Stewart's performance is no fair measure of what plaintiff's would have been for Stewart was obliged to incur substantial costs that plaintiff would not have incurred. For one thing, the lengthy period of time in excess of that which plaintiff would have spent on the

---

10. The detailed computations are set forth in findings 25–35.

11. To the costs anticipated in the bid estimate are added: (a) costs of correcting deficiencies in the work accomplished prior to the termination date ($5,812.60); increased costs of subcontract work for which subcontracts had not as yet been entered into as of the termination date

($2,133.96); costs of performing change orders issued after termination ($2,080.03); additional cleanup costs ($6,430.44); additional home office overhead ($34,010.86); cost of work plaintiff would have had the subcontractors perform which was not covered by the original subcontracts ($30,536.82); additional equipment servicing cost ($249.61), and additional bond premium ($2,009.80).

project, as hereinabove set forth, was costly. For another, Stewart found that, to induce the subcontractors to go forward with the work, it had to pay them amounts of approximately $80,000 over and above the amounts which plaintiff, under its subcontracts, would have been obliged to pay. Also, the labor inefficiency which Stewart encountered was costly. Such inefficiency was caused by the disruption of project operations and by the loss of the more skilled workmen who, while the project was shut down after the termination, found other employment. And finally, since Stewart was operating under a cost-plus contract, it necessarily would not have the same cost-cutting incentive as a contractor operating, as plaintiff was, on a fixed-price contract. Stewart readily acquiesced in every VA performance demand, including extensive compliance with numerous "punch list" requirements. After all, it was, under its cost reimbursement contract, being fully reimbursed for such compliance, as well as for all of its other contract costs—with all such costs (including the liquidated damages resulting from Stewart's delayed performance) being charged back to plaintiff.

██ Defendant particularly objects to the inclusion in plaintiff's excess cost damages of the increases in the subcontract prices which Stewart paid. Defendant's position is, apparently, that the subcontractors erred in claiming that the termination of plaintiff's right to proceed released them from their obligations to perform in accordance with their contracts with plaintiff, and that Stewart should not, therefore, have consented to pay them any increased amounts. Defendant draws a distinction between a termination of the prime contractor's right to proceed and a termination of the prime contract itself, and maintains that a termination of the former does not effect a contract termination releasing either the prime contractor or its subcontractors from their remaining contract obligations.

Whatever distinction may for certain purposes properly be drawn between a termination of a contractor's right to proceed and a termination of the contract itself,[12] it seems clear that for the purpose here involved, there would be no difference in result. On the one hand, it is difficult to conclude that the subcontractors' positions to the effect that their obligations under their subcontracts were at an end were not sound. Their contracts were only with the plaintiff.[13] When plaintiff could no longer proceed on the project, neither could they for, vis-a-vis the defendant, the prime contractor and the subcontractors were standing in the same shoes. Subcontractors normally have no independent relationship with the Government or any privity with it. Defendant points to no provision in any subcontract binding the subcontractor to continue to perform under the same subcontract provisions with a successor contractor such as Stewart, nor does defendant cite any authority for such proposition. Certainly no one contemporaneously took any such position. But in any event, defendant does not suggest that Stewart's decision to attempt to get plaintiff's subcontractors back on the job after plaintiff's ouster and the complete halt in project operations was not taken in good faith and on the basis of what it considered to be the most expeditious and practical manner of proceeding with the completion of the project. As such, the costs involved would necessarily constitute proper com-

12. In Dale Constr. Co. v. United States, 168 Ct.Cl. 692 (1964), where the termination clause was substantially identical with the one here involved, and the termination was also held to have been improper and a breach of the contract, the terms were used interchangeably and synonymously. However, on the basis of the issues there involved, no contention was apparently made that there was a distinction.

13. Or its legal successors in interest, the contracts containing the provision that "[t]his agreement shall bind the executors, administrators, successors and assigns of the parties hereto."

pletion cost components, all of which were, as stated, charged back to plaintiff.

■ Defendant further contends that, had there been no termination, plaintiff would also, in all probability, have had to incur increased costs in obtaining subcontractor performance since, in view of the extended contract performance time and the provision in the subcontracts that "Time is of Essence in this Contract," the subcontractors would have had "ample legal justification" [14] for demanding additional compensation to cover their increased labor and material costs. This contention, based as it is on what demands the subcontractors might have made against plaintiff, is speculative. Further, defendant cites no authority which would serve, in the absence of a specific provision covering the situation (such as an escalation clause), to uphold a subcontractor's position that, if the prime contract extends beyond the original completion date through no fault of the prime contractor, the subcontractor is thereby entitled to additional compensation. Such pertinent authority as the parties have cited points the other way. McDaniel v. Ashton-Mardian Co., 357 F.2d 511 (9th Cir. 1966) (a subcontractor is not entitled to increased compensation from the prime contractor where contract performance is delayed because of changes ordered by the Government). The subcontracts used on this project contained a provision requiring the subcontractor "to keep familiar at all times with the progress of the building and to furnish his materials and/or perform his labor in accordance therewith and as directed by the" prime contractor. There is no showing that, despite the lengthened period of contract performance, largely due to the cement shortage, the subcontractors were not as legally bound to perform at their subcontract prices as was plaintiff by its own contract price with the defendant. The calculation of plaintiff's projected completion costs has taken into consideration increased amounts which plaintiff would have had to pay to its subcontractors for various reasons (such as over $30,000 for work plaintiff would have had them perform which was not covered by their original subcontracts). The addition of further amounts equivalent to those which Stewart found it had to pay the subcontractors to induce them to complete their subcontracts, on the hypothesis that plaintiff would have to pay substantially the same amounts, is not justified.

The return to plaintiff of the completion costs in excess of those plaintiff reasonably would have incurred had there been no termination, in the amount of $419,797.03 (which includes the amount owed to the surety in respect thereof), puts plaintiff "in as good a position pecuniarily as [it] would have been in if the contract had been completely performed." G. L. Christian and Associates v. United States, 312 F.2d 418, 423, 160 Ct.Cl. 1, 11, cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963). Such excess completion cost application of this basic breach of contract rule was also made in the similar case of Dale Construction Co. v. United States, 168 Ct.Cl. 692 (1964). Plaintiff is entitled to recover such amount.

### Claim for Rental Value of Equipment, Machinery, and Tools

■ At the termination, plaintiff had at the job site various items of construction equipment, machinery, and tools which defendant took possession of pursuant to a provision of the "Termination for Default" clause stating:

> * * * If the Contractor's right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor.

When Stewart commenced its operations, defendant turned over to Stewart such equipment, machinery, and tools,

14. Def. Brief For The Commissioner, p. 137.

and Stewart used the items in completing the project. From time to time, various items were, as their use was no longer required, returned by Stewart to plaintiff with defendant's consent. Some items were not returned, having been lost or expended on the job.

These items, all of which plaintiff owned, were customarily moved by plaintiff from one job to another, as needed. As of the termination date, plaintiff was engaged in other construction projects and, had the items been available to it, would have used them on these projects.

Since the termination was improper, plaintiff claims that defendant's taking possession of the items was also improper, deprived plaintiff of their use for various periods of time, and constituted a taking of its property under the Fifth Amendment to the Constitution, which proscribes the taking of private property for public use without just compensation. Plaintiff seeks the market rental value of the items during the periods it was deprived of their use, plus interest at six percent per annum as part of just compensation.

Defendant objects to any recovery on this claim. It says plaintiff suffered no injury by reason of being deprived of the use of the items because "Stewart's use of said tools and equipment mitigated plaintiff's damages since Stewart's costs would have been greater had all such tools and equipment been immediately returned to Hedin." [15] It further argues that in any event, what occurred did not constitute a constitutional taking but instead only the exercise of a contract right, defendant again taking the position that "plaintiff argues as though the contract itself had been terminated which it was not, the entire contract still being in full force and effect." [16] Thus, defendant concludes that "[p]laintiff was not deprived of its tools and equipment—they were used on the job site *to complete its contract* which was still extant." [17]

Defendant's reasoning for not compensating plaintiff at all for the use of plaintiff's equipment, machinery, and tools in the completion of the project does not withstand analysis. To be sure, had Stewart not enjoyed the free use of these construction items owned by plaintiff, it would have been obliged either to rent similar equipment or to use its own, thereby increasing its completion costs. But this does not constitute a mitigation of damages, for plaintiff in turn would, by the judgment herein, have recovered such additional costs. Plaintiff's projected completion costs, calculated by the use of plaintiff's bid estimates, include the use cost of these items, but Stewart's completion costs contain no such cost. Thus the judgment with respect to the excess completion costs does not afford such compensation. Plaintiff is entitled to compensation in some manner for the use of these items by Stewart or for its being deprived of their use on other projects. Since the termination was improper, and plaintiff was thereby wrongfully deprived of the use of the items on its other projects, the damages for such deprivation may be measured by the rental value of the equipment, machinery, and tools from the time plaintiff was wrongfully deprived of their use to the dates they were returned to plaintiff or consumed as part of the project operations. Suburban Contracting Co. v. United States, 76 Ct.Cl. 533, 544 (1932), enunciates such rule of compensation as being proper in such a situation. The record satisfactorily shows the amount of such rental value as $47,715.67,

Plaintiff is not, however, entitled to interest on such rental value because what occurred cannot be considered as amounting to a constitutional taking. It is true that lack of intent to acquire a property interest or actually to effect a taking is not determinative of the question of whether a constitutional taking did occur. Eyherabide v. United States, 345 F.2d 565, 567, 170 Ct.Cl. 598,

15. Def. Brief For the Commissioner, p. 140.

16. *Id.*

17. *Id.*, p. 141.

601 (1965). Nevertheless, whether there was such a conscious intent is a proper subject of inquiry, together with all the other surrounding circumstances, in determining whether there was in fact such a taking. Biggs Rental Co. v. United States, 353 F.2d 1013, 1017, 173 Ct.Cl. 789, 796 (1965), cert. denied, 384 U.S. 927, 86 S.Ct. 1443, 16 L.Ed.2d 531 (1966); B Amusement Co. v. United States, 180 F.Supp. 386, 389, 148 Ct.Cl. 337, 341 (1960). It is plain that, in taking possession of the items in question and making them available for use in the completion of the project, defendant had no such intent but instead was simply following the procedure set forth in the above-quoted contract provision. That it ultimately turned out that it erred in terminating plaintiff's right to proceed under such contract clause and that it was not justified, therefore, in following the subsequent procedure set forth in the clause cannot serve to convert its action, taken in good faith in accordance with the contract, into a constitutional taking. As the court stated with respect to a similar contention in Acme Process Equipment Co. v. United States, 347 F.2d 509, 537–538, 171 Ct. Cl. 324, 371–372 (1965), rev'd on other grounds, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966):

> * * * The court's determination that liquidated damages were not properly assessable in no way negates the existence of a bona fide dispute involving difficult legal issues. * * * Although the defendant erred in believing that it could annul Acme's contract * * * it cannot be charged with bad faith. * * * In none of

these instances was the defendant's action without some color of right. Even though a court may determine eleven years later that the Government's premises were faulty, that does not alter the bona fide character of its original actions under the contract or convert the erroneous cancellation of the contract into a taking.

While the situation here is somewhat complicated because what is involved is a taking possession of property, nevertheless defendant's action in first taking over plaintiff's machinery, equipment, and tools, and then turning them over to the successor contractor for use in completing the contract was grounded upon, and simply another aspect or extension of, its original termination breach of contract. Plaintiff's receipt of the rental value of the items for the period it was deprived of their use gives it the damages to which it is entitled for such aspect of the breach.[18]

### Claim for Interest on Bank Loan

As shown, plaintiff made payments directly to Stewart to defray those costs of Stewart which were in excess of the contract proceeds. In May 1958, plaintiff executed a note made payable to Stewart's order in the amount of $480,-000. The note, which bore interest at six percent per annum, was guaranteed by the surety. Stewart then discounted the note at a bank, and thereafter plaintiff and the surety made the interest payments on the note to the bank. (The parties have referred to this transaction as a bank loan to the plaintiff.) The note was finally paid off some 8½ years later, i. e., on December 13, 1967. Dur-

18. Dale Constr. Co. v. United States, *supra* n. 12, 168 Ct.Cl. at 725, upon which plaintiff relies with respect to this claim, is not in point. In the first place the items there involved which defendant appropriated and for which the court awarded "reasonable market value" were not on the site for the purpose of being incorporated in or used on the project (at 811–812) and were not in fact used for such purpose by the successor contractor (at 813). Secondly, there is no indication that the court's use of the term "taking" indicated that what had occurred constituted a taking in the Fifth Amendment sense, no such reference being made thereto by the court. Nor, similarly, did the court indicate that the "reasonable market value" recovery it awarded was in the nature of just compensation for a Fifth Amendment taking. For instance, no portion of such recovery was denominated as interest as part of just compensation, no reference whatsoever being made to interest.

ing such extended period, interest payments on the note made by plaintiff and the surety totaled $54,282.38 and $160,868.66, respectively (plaintiff being liable to the surety for the payments the surety made on plaintiff's behalf). Plaintiff seeks recovery of these interest payments, totaling $215,154.04.

■ This claim is not allowable as a matter of law. Interest paid on bank loans made because of financial stringency resulting from a breach by the Government of a contract between it and the borrower is not recoverable as an item of damage. Ramsey v. United States, 101 F.Supp. 353, 121 Ct.Cl. 426 (1951), cert. denied, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952). "It is * * * well established that interest on borrowed money is not recoverable in suits against the Government unless it is called for in the contract itself or in the governing statute. Neither of these conditions is found here." Marshall v. United States, 164 F.Supp. 221, 224, 143 Ct.Cl. 51, 56–57 (1958). The statutory prohibition against the allowance of interest [19] cannot be circumvented by casting the claim in the form of an item of damage for breach of contract.

As to the interest on borrowed money: The delay forced the contractor to borrow money to carry on his contract; for this he was forced to pay interest, an extra expense. The recovery of this sum in this court is forbidden by statute: whether it is claimed in the guise of a damage caused by delay, or in some other form, it remains in fact a claim for interest, and such a claim we are prohibited from allowing. (Rev.Stat., § 1091) The distinction by plaintiff sought to be made, is one of terms only, not of substance. If plaintiff had used his own money and so lost the interest which it might have earned for him, the claim would have been as meri-

torious, but would not have differed in principle from that now made. [Myerle, Executor v. United States, 33 Ct.Cl. 1, 25 (1897)]

■ Furthermore, as a factual matter, the proof is not sufficient to show that plaintiff's financial stringency leading to the borrowing of these funds was attributable solely to, and was therefore directly caused by, the improper termination. Plaintiff's proof is in essence based only on naked assertions to such effect. During the period plaintiff and Stewart were engaged in the construction of the project here involved, plaintiff was also fulfilling other construction contracts of substantial size. In addition, plaintiff was engaged in another unrelated business, a hotel. The security given by plaintiff to the surety for its guarantee on the note included the receipts from plaintiff's other construction contracts. The cement shortage was nationwide. The delays it caused to all construction operations then in progress and requiring cement must have been costly. The record is not sufficient to support plaintiff's contention that the financial condition in which it found itself at the time it was required to borrow the $480,000 was attributable solely to defendant's termination breach on the instant project, and that, but for such breach, it would not have had to borrow such funds. Proof of such proximate causation is a prerequisite to recovery. Fawick Corp. v. United States, 149 Ct.Cl. 623, 636–637 (1960). And, insofar as the basic rule relating to breach of contract damages requires that "[t]he damage must be such as was to have been foreseen by the parties, who are assumed to have considered the situation, the contract, and the usual course of events," and that "eliminated from this consideration must be any condition of affairs peculiar to the contractor individually in the particular case and not of general application under similar conditions," Myerle, Executor v. United

19. 28 U.S.C. § 2516(a) (1970) provides that: "Interest on a claim against the United States shall be allowed in a judg-

ment by the Court of Claims only under a contract or Act of Congress expressly providing for payment thereof."

States, *supra*, 33 Ct.Cl. at 27, neither the necessity of borrowing, nor the size of the loan, nor the fact that it would not be paid off until over eight years later could be considered as meeting these conditions.

The cases upon which plaintiff relies in which interest has been allowed are on their facts plainly not comparable. Peoria Tribe v. United States, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968), involved the Government's breach of a treaty under which it was to invest certain funds and pay the annual income therefrom to an Indian tribe. The breach resulted in a smaller sum to invest and a consequent reduction in the amount of annual income. The Court held that the proper measure of damages in such a situation would be the extent by which the annual income to the tribe was reduced and that such a recovery would not constitute a violation of the general rule against awarding interest against the United States.[20] Continental Bank & Trust Co. v. United States, 416 F.2d 1296, 189 Ct.Cl. 99 (1969), was not a breach of contract case. It involved the proper interpretation of the Assignment of Claims Act of 1940, as amended.[21] The court held that the recovery by the assignee bank, from the contract sums being retained by the Government, of the amount the assignor-contractor owed the bank on loans secured by the assignment, plus accrued interest at the rate specified in the loan documents, would be proper under the Act. Phillips Construction Co. v. United States, 374 F.2d 538, 179 Ct.Cl. 54 (1967); 188 Ct.Cl. 1157 (1969), involved the proper amount due a contractor under the Capehart Housing Act, such amount being designed, under the Act, to cover the con-tractor's costs, including both construction and permanent financing. Under the program, the contractor was required to borrow the full amount of its costs. The court held that, in these circumstances, the contractor could recover increased interest costs resulting from extensions of the construction period due to circumstances covered by the Changed Conditions clause of the contract. The increased interest charges resulted in a reduction of the amount of the loan available for actual construction purposes and caused the contractor to suffer a loss on the construction.[22] Bell v. United States, 404 F.2d 975, 984, 186 Ct.Cl. 189, 205–206 (1968), which similarly is not concerned with damages for breach of contract, holds that interest on borrowings may be allowed as a cost in calculating the amount of an equitable adjustment under the Changes article of a contract.

None of these cases relied on by plaintiff supports the claim for interest which it here makes.

### Claim for Interest on Principal Amounts Paid by the Surety

The surety paid to the bank $461,810.95 of the $480,000 note plaintiff executed. In addition, it made direct payments of $46,710.50 to Stewart to defray, in part, Stewart's completion costs. Under its indemnity agreement, plaintiff is obligated to reimburse the surety for all of the costs and expenses of whatever kind incurred by the surety in relation to any of plaintiff's contracts, "with legal interest." Plaintiff seeks interest at six percent per annum on said surety payments totaling $508,521.48 which the surety has made on plaintiff's behalf. On such basis, the interest, computed to January 1, 1970, amounts to

---

20. " * * * this is not a case where the Court is asked to exercise 'the power to award interest against the United States,' United States v. N. Y. Rayon Importing Co., 329 U.S. 654, 663, 67 S.Ct. 601, 606, 91 L.Ed. 577. The issue, rather, concerns the measure of damages, for the treaty's violation in the light of the Government's obligations under that treaty." 390 U.S. at 470–471, 88 S.Ct. at 1138.

21. 41 U.S.C. § 15, 31 U.S.C. § 203 (1964).

22. "It was inherent in the scheme of the Act that the contractor would obtain private financing and pay interest, and interest costs were placed in the very same category as more tangible costs of construction." 374 F.2d at 540, 179 Ct.Cl. at 58.

$112,155.09, which plaintiff here claims, plus $18.43 per day from such date, representing the amount of interest accruing daily at such six percent rate.

The principal amounts paid by the surety to the bank and Stewart on plaintiff's behalf resulted in debts owing by plaintiff to the surety under the indemnity agreement. Such amounts, in effect, constituted loans by the surety to the plaintiff. Plaintiff refers to them as "advances." [23] For the reasons already indicated, interest on borrowings, whether from a bank or a private party, is not a proper item of damage in a breach of contract suit such as is here involved.

### Claim for Cost of Employees Retained at the Site Following Termination

After the termination notice was issued, plaintiff attempted to have it rescinded and to persuade defendant to permit plaintiff to complete the project. For that reason, it retained certain employees in the job area, feeling that, if it were successful in its effort, it would then be in a better position to proceed promptly with the work. However, the last such employee was withdrawn at the end of January 1957. Stewart commenced its operations on January 24, 1957, and it then became obvious that plaintiff's effort would not succeed. The total amount plaintiff paid to such standby employees was $3,961.27, which plaintiff claims.

These costs are not recoverable. They are not costs necessarily incurred for and relating to project construction operations; nor do they meet the proximate cause and foreseeability requirements hereinabove set forth as prerequisites to a recovery of damages for breach of contract. They are, instead, in the nature of expenses incurred in attempting to obtain administrative relief. Such expenses are not proper damage items.

Rash v. United States, 360 F.2d 940, 947, 175 Ct.Cl. 797, 810 (1966).

The employee standby costs held to be recoverable in Dale Construction Co. v. United States, 161 Ct.Cl. 825, 831–832 (1963), upon which plaintiff relies in support of this claim, were of a different nature. There, the contractor was, pursuant to a contract provision, entitled to receive a notice to proceed with a specified portion of the contract work by a certain date. Defendant's failure ever to issue such a notice (because of its decision to eliminate such portion of the contract work) was held to constitute a breach of the contract entitling plaintiff to the damages it suffered thereby, including the costs and expenses it reasonably incurred in preparing to perform the work in question. Included therein were the standby costs for two employees who were awaiting the issuance of the notice to proceed. These were, obviously, costs that were necessarily related to the commencement of the construction which would follow the proceed notice defendant was obligated to issue. They were in the same category as all the other reasonably incurred preparatory costs which the contractor was permitted to recover.

### Claim for Legal Expenses Incurred in Takeover of Project by the Surety

As shown, after the termination of plaintiff's right to proceed, defendant offered the surety the opportunity of taking the project over and completing it through a contractor other than the plaintiff. In connection with the takeover negotiations with the VA, and in effecting the actual takeover, the surety necessarily incurred certain legal expenses totaling $1,330. Plaintiff is liable to the surety for these takeover expenses.

Defendant admits that this item constitutes a charge properly attributable to the termination which plaintiff would

---

**23.** Pl. Proposed Findings of Fact and Memorandum of Law to the Commissioner, pp. 79, 84, 115.

not have suffered had it been allowed to continue, and accordingly concedes liability therefor. No reason is apparent for not implementing the parties' agreement with respect to this item.

### Claim for Additional Bond Premium

■ The original performance bond issued by the surety covered the two-year period from January 11, 1955, the contract date. Had there been no termination, an additional performance bond premium would thus have become due on January 11, 1957. Considering what plaintiff's cost of the uncompleted work on the project would have been as of such date, when approximately twenty percent of the project would have remained to be performed, and that plaintiff would have completed the project in 1957 (these being the factors on which the additional bond premium would have been computed), the cost of such additional bond premium to plaintiff would have been $2,009.80. However, because of the much larger completion costs that Stewart incurred, and the fact that Stewart did not complete the project until 1958, the additional bond premium was actually $8,286, for all of which plaintiff became liable. Accordingly, plaintiff incurred, by reason of the termination, an excess bond premium liability in the amount of $6,276.20, which plaintiff is entitled to recover.[24]

### Liquidated Damages and Protective Costs Incurred by the VA

■ As noted, the court, by its decision of March 14, 1969, held that plaintiff is entitled to recover the erroneous assessments which the VA made against

it of (a) liquidated damages (to Stewart's completion date of February 11, 1958) in the amount of $155,400, and (b) the costs incurred by the VA, in the amount of $8,769.33, in protecting the project subsequent to the termination.

However, since, as hereinabove set forth, plaintiff would not have completed the project until June 1, 1957, and the parties have stipulated that plaintiff was entitled to time extensions only up to March 8, 1957, plaintiff would consequently have become liable for liquidated damages at the contract rate of $300 per day for 84 calendar days, amounting to $25,200. This amount must, therefore, be deducted from plaintiff's recovery.

### Summary

On the basis of all the above considerations, plaintiff is entitled to recover the following damages as a result of the improper termination by defendant of plaintiff's right to proceed:

| | |
|---|---:|
| Excess completion costs | $419,797.03 |
| Rental value of plaintiff's equipment, machinery, and tools used by Stewart | 47,715.67 |
| Expenses incurred by surety in effecting its takeover of the project | 1,330.00 |
| Excess bond premium | 6,276.20 |
| Liquidated damages assessed by VA | 155,400.00 |
| Post-termination project protection costs assessed by VA | 8,769.33 |
| Total | 639,288.23 |
| Less liquidated damages, March 8, 1957 —June 1, 1957 | 25,200.00 |
| Net recoverable damages | 614,088.23 |

This recovery, it should be noted, does not result in plaintiff's realizing any profit on the contract operations. The record shows that, had there been no termination, plaintiff's total construction costs would have been $2,134,208.19.[25]

---

24. The $2,009.80 plaintiff would have had to pay has been included in plaintiff's projected completion costs for the purpose of calculating plaintiff's excess completion cost damages. See n. 11. However, the $8,286 figure has not been included in Stewart's completion costs. It was never paid by or charged to Stewart. It was, instead, charged to plaintiff. Accordingly, the difference of $6,276.20 is not included in the excess completion cost

part of the judgment herein. Instead (like the item for the use of plaintiff's machinery, equipment, and tools, which also was not included in Stewart's construction costs), its separate recovery here is treated as a nonconstruction item.

25. Plaintiff's costs up to the termination date were $1,286,076.20. As set forth herein, plaintiff's costs of completing the project, had there been no termination,

The excess completion costs of $419,797.-03 which plaintiff is permitted to recover herein reduces plaintiff's total costs to such $2,134,208.19 figure. However, the net contract receipts with which plaintiff is to be credited, without diminution by reason of the improper VA liquidated damage and protective cost assessments, total only $1,984,605.36.[26] Thus, even with the excess completion cost recovery allowed herein, and the return to it of the improper VA liquidated damage and protective cost assessments, plaintiff will incur a loss of $149,602.83. (Even adding the other items of recovery allowed herein, which have been treated as non-construction items, no profit is produced, since they total only $55,321.87.) Accordingly, that part of the recovery herein related to the post-termination project operations serves to place plaintiff in the same loss position in which it would have been had it been permitted to complete the project.

The reasons why plaintiff would not have earned any profit even had there been no termination must lie in good part in the circumstance that plaintiff's successful bid of $1,989,000 on this contract included only a relatively small profit of $80,000, or approximately four percent of its bid price, and was predicated on a projected construction period of 16 months. Instead, had there been no termination, the construction period would have extended to around 27 months. This prolonged period, caused principally by the cement shortage, necessarily would have contributed materially to plaintiff's failure to realize the relatively small profit included in its bid and to the incurrence, instead, of a loss of approximately $150,000. Although, as this court has held, plaintiff was entitled to an extension of time for the delay to its project operations caused by the cement shortage, plaintiff was, nevertheless, not entitled by any contract provision to additional compensation to defray its increased costs caused by such delay.

For the reasons indicated, plaintiff is entitled to recover the sum of $614,088.-23.[27]

would have been $848,131.99. Thus plaintiff's total costs would have been $2,134,208.19.

26. The total contract proceeds, including change orders, amounted to $2,009,805.-36. Since plaintiff would have been properly charged with $25,200 in liquidated damages, its net contract receipts would have been $1,984,605.36.

27. Defendant refers to the surety's being the "real party in interest here" (Def. Brief For the Commissioner, p. 138) because (a) one of its officials is presently the president of the plaintiff (since, by reason of an assignment by Mr. Hedin, plaintiff's former president, of his stock in the plaintiff as security for the surety's guarantee of the $480,000 note executed by plaintiff, the surety presently has effective control of plaintiff); and (b) a 1966 agreement between plaintiff and the surety requires that plaintiff will press its suit in this court; that the surety will pay all the expenses of the litigation, with Mr. Hedin agreeing to cooperate in the establishment of the claims involved; and that the proceeds of any judgment will be applied, first, to reimburse the surety for its litigation expenses; second, to pay the surety $50,-000 for its sole use and benefit; and third, to a 70–30 percent division of any remainder to the surety and the plaintiff, respectively. (The agreement further provides that upon termination of the case in this court, the surety will, whether or not there is a recovery, transfer all of the stock assigned as security back to Mr. Hedin or his nominee.)

However, defendant does not employ the term "real party in interest" in a sense that would preclude a judgment's being entered in plaintiff's favor. (Id., p. 139) Defendant makes the observation only to point out that it did not discover the above arrangements between the plaintiff and the surety until their disclosure in the midst of trial and that such late discovery possibly served to prejudice its trial preparation and defense of the litigation. Defendant does not however, satisfactorily explain in what respect it could have been prejudiced by such discovery of temporary surety control of the plaintiff corporation. The pretrial proceedings with respect to the damage aspects of this case were extensive. In any event, defendant did not, upon making the discovery, request any relief upon the basis of prejudicial surprise.

