United States Court of Appeals for the Federal Circuit

 04-1006

 Gordon R. England, SECRETARY OF THE NAVY,

 Appellant,

 v.

 CONTEL ADVANCED SYSTEMS, INC.,

 Appellee.

 James D. Colt, Attorney, Commercial Litigation Branch, Civil
Division, United States Department of Justice, of Washington, DC,
argued for appellant. On the brief were Peter D. Keisler, Assistant
Attorney General; David M. Cohen, Director; Mark A. Melnick, Assistant
Director; and Nancy M. Kim, Trial Attorney.

 Gayle R. Girod, Reed Smith, LLP, of Washington, DC, argued for
appellee. With her on the brief was Natalia W. Geren.

Appealed from: Armed Services Board of Contract Appeals

 United States Court of Appeals for the Federal Circuit

 04-1006

 Gordon R. England, SECRETARY OF THE NAVY,

 Appellant,

 v.

 CONTEL ADVANCED SYSTEMS, INC.,

 Appellee.

 ___________________________

 DECIDED: October 6, 2004
 ___________________________

Before NEWMAN, LOURIE and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK. Dissenting opinion
filed by Circuit Judge NEWMAN.

DYK, Circuit Judge.

 Appellant the Secretary of the Navy (“the Navy”) appeals from the
decision of the Armed Services Board of Contract Appeals (“ASBCA” or
“the Board”) finding the Navy liable to Contel Advanced Systems, Inc.
(“CASI”) for breach of contract and remanding to the contracting
officer for determination of quantum. Contel Advanced Systems, Inc.
v. England, ASBCA Nos. 50648, 50649, 51048, 51049 (June 11, 2003). We
hold that Contel’s claim is essentially a claim for interest and
barred by the no-interest rule. Accordingly, we reverse.

 BACKGROUND
 This dispute stems from a contract to design, install and
maintain a telecommunication system (“the project”) for the Naval
Weapons Center in China Lake, California. In 1987, the Navy issued a
request for proposal (“RFP”) for the project. The project was to take
place in two phases: (1) an implementation phase, during which the
telecommunication system would be designed and installed; and (2) a
maintenance and administration phase. During the implementation
phase, the contractor would first prepare a station design plan
(“SDP”). After the SDP was approved by the Navy, the contractor would
install the system. Thereafter, “cutover” (the time when the new
telecommunication system replaced the old one) and implementation
would occur. If certain performance goals were met, system acceptance
would occur 30 days after cutover.
 The dispute here involves one aspect of the contract relating to
the implementation phase. When the RFP issued, the Navy did not know
the exact quantities of certain types of station/ancillary equipment
that it would need. This equipment was listed under contract line
item number B007 (“CLIN B007”). Offerors were instructed to provide
fixed unit prices for items under CLIN B007. The Navy would then
multiply the unit prices by its best estimate of quantity to arrive at
a bid for the project. The RFP stated that the “total price for
[CLIN] B007 shall be redetermined based on the quantity of equipment
actually installed,” pursuant to the approved SDP. (J.A. at 120.)
Thus, the amount of equipment included under CLIN B007 in the original
offer was to be adjusted to reflect the actual amount of equipment
installed according to the SDP, and the final price was to be adjusted
accordingly. The RFP asked potential offerors to quote prices for the
implementation phase under four different methods of purchase: (1)
straight purchase, (2) lease to ownership (“LTO”), (3) lease with
option to purchase, and (4) straight lease.
 CASI submitted an offer in accordance with the RFP and was
awarded the contract for the project in September 1990. The Navy
opted to purchase the implementation phase of the contract at the LTO
price of $30,009,154.80 to be paid in 60 monthly installments. Under
the LTO option, the Navy’s installment payments included an interest
component.
 CASI prepared its initial SDP in January of 1991. It was
approved by the Navy a few months later. Soon after, the parties
executed several price modifications that increased the tentative LTO
price for the implementation phase to $36,223,371. This new tentative
LTO price was based on quantity estimates for several CLIN B007 items.
 The parties recognized that a number of these quantity estimates were
significantly higher than the actual amount of equipment that would be
installed under the approved SDP. In January 1992 CASI requested the
Navy to reduce the LTO price to reflect these overestimates. In April
and May of 1992 CASI performed an audit to ascertain the amounts of
equipment actually installed and submitted a letter to the Navy,
recommending that the LTO price be adjusted downward to $33.5 million.
 The parties met in May 1992 to modify the LTO price but were unable
to agree to a modification at that time. Thereafter, the Navy issued
a unilateral modification that, among other things, stated that the
LTO price for the implementation phase remained at approximately $36.2
million. Cutover occurred on April 10, 1992, and system acceptance
occurred on May 11, 1992.
 In order to fund its expenditures during the implementation
phase, CASI obtained a loan from its parent corporation. The full
balance of this loan was due upon system acceptance. However, under
the project contract, CASI would only begin to receive installment
payments for the implementation after system acceptance. To repay the
obligation to its parent corporation on system acceptance, CASI sought
to obtain a third-party loan under which it would assign the Navy’s
installment payments to the lender. While the Navy at no time
directed CASI to obtain financing, it refused to make payments to the
third-party lender unless the invoices exactly matched the official
contract price of approximately $36.2 million. CASI concluded that it
could obtain financing only if it borrowed the full amount of the
existing contract price. CASI borrowed a principal of approximately
$27 million, an amount equivalent to the May 1992 contract price of
approximately $36.2 million, once interest over the LTO term was added
in. The approximately $27 million that was borrowed exceeded the
principal amount of the equipment actually purchased under the SDP.
The excess borrowed funds were placed in an interest-bearing account.
The interest rate on the deposited amount was far lower than the cost
of borrowing from the third-party lender.
 After system acceptance, the Navy began making monthly payments
of about $600,000 (approximately one-sixtieth of the official contract
price of approximately $36.2 million) to CASI’s third-party lender.
This continued until October 1996 when the Navy finally issued a
unilateral modification reducing the LTO price to $32,351,679, a net
decrease of approximately $4.4 million.1 Curiously, CASI, which had
earlier insisted that the Navy reduce the contract price, objected
“that the LTO[ ] reconciliation was erroneous, and the Navy had no
authority to unilaterally reduce the contract value.” Contel, slip
op. at 22. At this time the Navy had made 52 installment payments.
After making another installment payment in November and a partial
payment in December 1996, the Navy concluded that it had repaid the
entire adjusted contract price and ceased making installment payments.
 Following the Navy’s refusal to pay the remaining installment
payments, the third-party lender demanded payment from CASI. CASI
negotiated a new payment schedule with the third-party lender, which
required it to pay the lender an additional $2,121,106, representing
interest owed on the funds borrowed in excess of the final contract
price, less the interest CASI earned from the deposit of these funds
prior to the determination of the final contract price.
 On February 4, 1997, CASI submitted a certified claim to the
contracting officer (“CO”) for $2,121,106, which as it explained
represented the additional interest costs it suffered as a result of
the Navy’s failure to reconcile the LTO price in 1992. In a final
decision dated March 14, 1997, the CO denied this claim because there
“was no agreement for reimbursement of any costs incurred by CASI for
financing” and “[h]ow a contractor finances its efforts . . . is not
the Government’s concern.” (J.A. at 248-249.) The CO also blamed the
delay in finalizing the LTO price on CASI’s failure to promptly
provide an “accurate accounting” of the equipment installed. (J.A. at
248.) Further, the CO determined that the Navy had actually overpaid
CASI by $279,464.32 and demanded repayment in this amount.
 Several months later, CASI submitted a second certified claim
that asserted “alternative theor[ies] of recovery.” (J.A. at 251.)
Specifically, CASI argued that the LTO price should not have been
adjusted downward because it was set at a fixed price of approximately
$36.8 million, regardless of the quantities of equipment installed.
CASI also urged that it was entitled to the “administrative costs” and
attorney’s fees it incurred as a result of the Navy’s “wrongful
cessation of payments” to the third-party lender. (J.A. at 252–53.)
 Both of these theories were also rejected, and CASI appealed the
denial of both certified claims to the ASBCA.
 On June 11, 2003, the ASBCA issued a decision in favor of CASI on
its first certified claim. The Board held that “the Navy had a duty
to reconcile the [LTO price] no later than system acceptance and its
refusal without a valid excuse to do so was a breach of its duty to
cooperate and a breach of contract.” Contel, slip op. at 26
(citations omitted). It rejected the Navy’s arguments that “various
unresolved obstacles prevented it from reconciling the LTO[ ] price by
system acceptance,” because it found that “reconciliation,” i.e.,
reduction of the LTO price based upon the quantity of equipment
actually installed, “could have been accomplished based on the
information in the SDP” and that “CASI was eager to complete the
reconciliation.” Id. at 30.
 The Board further held that the “no-interest rule” did not bar
recovery on the first certified claim, which represented the
additional interest costs CASI suffered as a result of the Navy’s
failure to promptly reconcile the LTO price. The ASBCA recognized
that generally the “no-interest rule” bars the recovery of interest on
delayed or defaulted money payments from the government, but that the
rule can be waived by including “a provision in a Government Contract
for the payment of interest [that is] ‘affirmative, clear cut, and
unambiguous.’” Contel, slip op. at 27 (quoting United States v.
Thayer-West Point Hotel Co., 329 U.S. 585, 590 (1947)). According to
the Board, the no-interest rule had been waived in this case because
“[t]he payment of interest was an integral part of the parties’
contract.” Id. This was evidenced by the intentional inclusion of “a
component for interest” in the required monthly installment payments.
Id. Because “the payment of interest . . . was required by the
contract” itself, the ASBCA held that the no-interest rule did not bar
recovery on CASI’s first certified claim.2 Having decided that CASI
was entitled to recover on its first certified claim, the ASBCA
remanded to the CO for a determination of quantum.
 The Board dismissed as duplicative the alternative theories of
recovery presented in CASI’s second certified claim. It explained that
the second certified claim did not present new claims, but merely
“present[ed] an alternate method of measuring CASI’s claimed damages
and supplement[ed] the [first] certified claim to specifically
identify certain costs allegedly incurred in repairing its financial
relations . . . when the Navy ceased making the payments called for by
the payment schedule.” Id. at 24.
 The Navy appealed the ASBCA’s decision on CASI’s first certified
claim. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).
 DISCUSSION
 We review legal conclusions of the ASBCA without deference.
Rumsfeld v. Applied Cos., 325 F.3d 1328, 1334 (Fed. Cir. 2003)
(“Applied Companies”). The interpretation of a contract by the ASBCA
is a question of law that is reviewed without deference on appeal.
Metric Constructors v. Nat’l Aeronautics and Space Admin., 169 F.3d
747, 751 (Fed. Cir. 1999). The Board’s findings of fact are accepted
unless they are “fraudulent, or arbitrary, or capricious, or so
grossly erroneous as to necessarily imply bad faith, or if such
decision is not supported by substantial evidence.” E.L. Hamm &
Assocs. v. England, 379 F.3d 1334, 1338 (Fed. Cir. 2004).
 I
 We must first determine whether we have jurisdiction to hear
this case. CASI contends that the decision of the ASBCA was not final
because it decided only entitlement and did not reach quantum. We
disagree.
 Although 28 U.S.C. § 1295(a)(10) refers to an appeal from a
“final decision,” our cases have repeatedly held that the concept of
finality in this context is a flexible concept. Brownlee v. Dyncorp,
349 F.3d 1343, 1347 (Fed. Cir. 2003) (“Dyncorp”). Under section
1295(a)(10), “[t]he relevant inquiry in determining finality . . . is
‘the scope of the contracting officer’s decision, for this determines
the extent of the contractor’s right of appeal and the board’s
jurisdiction.’” Id. (quoting Dewey Elecs. Co. v. United States, 803
F.2d 650, 655 (Fed. Cir. 1986)). In cases where the contracting
officer had not yet reached issues of quantum and thus, only
entitlement was before the Board, we have repeatedly found the Board’s
decision on entitlement “final” and within our jurisdiction under
section 1295(a)(10). See Dyncorp., 349 F.3d at 1347; Applied Cos.,
325 F.3d at 1333 n.3; Dewey, 803 F.2d at 654-58. As we noted in
Applied Companies, “where the contracting officer decided only
entitlement and the board thereafter decided entitlement and remanded
to the parties regarding quantum, the board’s decision was final and
thus appealable.” 325 F.3d at 1333 n.3.
 In this case, we have jurisdiction under section 1295(a)(10)
because the scope of the CO’s decision was limited to the question of
entitlement. CASI argues that the CO decided quantum because, in
addition to rejecting CASI’s claims, the CO determined that the Navy
had overpaid CASI in the amount of $279,464.32. However, the Navy’s
overpayment claim against CASI was separate from CASI’s claim for
damages against the Navy.3 Because the CO determined that CASI was
not entitled to damages, the CO never determined the quantum required
by CASI’s claims. The ASBCA recognized the limited scope of the CO’s
decision. It stated that “[o]nly entitlement is before the Board” and
“remanded to the parties to negotiate quantum.” Contel, slip op. at
2. Thus, we conclude that the ASBCA’s decision was a “final decision”
on the issue of entitlement. There is jurisdiction under section
1295(a)(10) to hear the Navy’s appeal.4
 II
 On the merits, the Navy argues that CASI is seeking interest
damages that are barred by the no-interest rule. The no-interest rule
bars the award of interest damages on a claim against the United
States. Library of Congress v. Shaw, 478 U.S. 310, 317 (1986)
(“Shaw”). The appellant contends that the ASBCA erred by inferring a
waiver of that rule. We agree with the Navy that the no-interest rule
is applicable here and has not been waived.
 A
 CASI urges that the no-interest rule does not apply because
“[t]he interest CASI seeks is not interest on a substantive claim, but
the cost of money that the Government agreed to pay in order to defer
payment.” (Br. of Appellee at 13.)
 The no-interest rule is an aspect of the basic rule of sovereign
immunity. See Shaw, 478 U.S. at 315; see also Smith v. Principi, 281
F.3d 1384 (Fed. Cir. 2002). It has been construed to apply broadly to
claims for interest. In Shaw the Supreme Court explained that:
 [T]he force of the no-interest rule cannot be avoided simply by
 devising a new name for an old institution: “[T]he character or
 nature of ‘interest’ cannot be changed by calling it ‘damages,’
 ‘loss,’ ‘earned increment,’ ‘just compensation,’ ‘discount,’
 ‘offset,’ or ‘penalty,’ or any other term, because it is still
 interest and the no-interest rule applies to it.”

Shaw, 478 U.S. at 321 (quoting United States v. Mescalero Apache
Tribe, 518 F.2d 1309, 1322 (Ct. Cl. 1975) (alteration in original)).
The rule has been held not only to bar the recovery of interest on
substantive claims against the government, see, e.g., Smith, 281 F.3d
at 1387, but also interest costs incurred on money borrowed as a
result of the government’s breach or delay in payment, see, e.g., J.D.
Hedin Constr. Co. v. United States, 456 F.2d 1315, 1330 (Ct. Cl.
1972); see also Komatsu Mfg. Co. v. United States, 131 F. Supp. 949,
950 (Ct. Cl. 1955); Ramsey v. United States, 101 F. Supp. 353, 356-57
(Ct. Cl. 1951); Myerle v. United States, 33 Ct. Cl. 1, 25 (1897). For
example, in J.D. Hedin, our predecessor court held that, like interest
on substantive claims against the government, “[i]nterest paid on bank
loans made because of financial stringency resulting from a breach by
the Government of a contract between it and the borrower is not
recoverable.” 456 F.2d at 1330. The court noted that had the
plaintiff “used his own money and so lost the interest which it might
have earned for him, the claim . . . would not have differed in
principle.” Id. (quoting Myerle, 33 Ct. Cl. at 25).
 So too, the no-interest rule is applicable to CASI’s claim.
CASI’s claim states that the claimed “amount represents the interest
on funds which CASI urged the Navy to prepay in the Spring of 1992.”
(J.A. at 245.) In other words, CASI is seeking to recover the
interest it paid on the extra money it was forced to borrow as a
result of the Navy’s delay in reconciling the LTO price. In the
absence of a waiver, the no-interest rule bars the recovery of such
interest damages against the government. See, e.g., J.D. Hedin, 456
F.2d at 1330; Komatsu, 131 F. Supp. at 950; Ramsey, 101 F. Supp. at
356-57; Myerle, 33 Ct. Cl. at 25.
 B
 In the alternative, CASI argues that the no-interest rule has
been waived by provision of its contract with the Navy. The no-
interest rule can be waived only by “specific provision by contract or
statute, or express consent by Congress.” Shaw, 478 U.S. at 317
(internal quotation and alterations omitted); see also United States
v. Thayer-West Point Hotel Co., 329 U.S. 585, 590 (1947) (“Thayer-
West”) (stating that a provision requiring the government to pay
interest “must be affirmative, clear-cut, [and] unambiguous.”). While
there is no argument that the rule was waived by statute, CASI argues
the Navy waived the no-interest rule because the LTO price under the
contract included an interest component. We disagree.
 The claim here is not for the interest component of the LTO
price, which the Navy has already paid. Instead, CASI claims it is
entitled to “the additional amount of interest . . . owed to the bank”
as a result of its third-party financing. (Br. of Appellee at 20.)
The inclusion of the interest component in the LTO price is not an
“affirmative, clear-cut, [and] unambiguous” agreement to pay for
additional interest accrued on a third-party loan as the result of the
Navy’s breach. See Thayer-West, 329 U.S. at 590. To the contrary,
the contract is silent as to the method by which CASI was to fund the
project.
 The ASBCA found that the Navy “insist[ed] that the amount
borrowed reflect the current LTO[ ] contract amount” and that “CASI’s
decision to proceed as it did [by borrowing more money than it knew it
was actually due] was a reasonable response.” Contel, slip op. at 16.
 The basis for these findings is less than clear. CASI does not
explain how the Navy’s insistence on the rendering of invoices
corresponding to the May 1992 contract price compelled CASI to borrow
more money than it knew it would ultimately be paid under the
contract. However, even assuming that the Board’s findings were
correct, at most the Navy required only that CASI borrow an amount
equivalent to the May 1992 LTO price, if CASI elected to assign the
Navy’s installment payments. There is no suggestion that the Navy
required CASI to obtain financing, or otherwise instructed CASI to
borrow money. Indeed, the Board specifically found that “[t]he Navy
did not instruct CASI to borrow money, nor express any opinion as to
whether or not CASI should enter into any particular form of financing
agreement.” Contel, slip op. at 8. The fact that the Navy was aware
of the financing arrangement, and apparently inflexible in its
requirements for assignment of the installment payments, is not
sufficient to waive the no-interest rule.
 Because there has been no waiver, the no-interest rule bars CASI
from recovering the excess interest costs that occurred as a result of
the Navy’s failure to promptly reconcile the LTO price upon system
acceptance. The ASBCA erred in holding that CASI was entitled to
recover on its first certified claim.
 III
 Finally, CASI contends that its second certified claim provided
an “alternative theory of recovery” that was not based on the
additional amount of interest that CASI owed the third-party lender,
and therefore is not barred by the no-interest rule. (Br. of Appellee
at 20.) Under this alternative theory, CASI argues that the cost of
the implementation phase was awarded on a fixed price basis for a LTO
price of approximately $36.8 million. Because the price was fixed,
CASI contends that it is entitled to “the difference between the
current LTO[ ] fixed price of $36,802,685.08 and the amount paid to
date by the Navy for [the implementation phase].” (J.A. at 252.)
This argument fails for a number of reasons.
 First, both the contract and the RFP make clear that the
estimated quantities of CLIN B007 equipment, upon which the LTO price
was based, were subject to change. The project contract stated that:
“[t]his is an indefinite-quantity contract for the supplies or
services specified . . . in the Schedule. The quantity of supplies
and services specified in the Schedule are estimates only and are not
purchased by this contract.” (J.A. at 93.) So too, the RFP made
clear that the LTO price was not fixed. It recited that “[t]he total
price for [CLIN] B007 shall be redetermined based on the quantity of
equipment actually installed in accordance with the Government-
approved Station Design Plan.” (J.A. at 120.)
 Moreover, both parties clearly understood that the LTO price was
not fixed. CASI in fact repeatedly urged the Navy to adjust the LTO
price to reflect the actual quantity of equipment installed.
According to the ASBCA’s findings, CASI asked the Navy to adjust the
LTO price to approximately $33.5 million prior to system acceptance.
The parties later met in a failed attempt to modify the LTO price to
reflect the equipment installed under the SDP. After system
acceptance in June and July of 1992, CASI continued to urge the Navy
to decrease the LTO price. Contel, slip op. at 19.
 For these reasons, we conclude that the LTO price for the
implementation phase of the project was not fixed, but was to be
adjusted according to the actual quantity of equipment installed. We
therefore reject this “alternative theory of recovery” as presented in
CASI’s second certified claim.5
 CONCLUSION
 We hold that the no-interest rule applies to CASI’s first
certified claim for interest damages incurred as a result of the
Navy’s delay in reducing the LTO price to reflect the actual
quantities of equipment installed. Because we conclude that there has
been no waiver of the no-interest rule, the ASBCA’s decision that CASI
was entitled to damages under the first certified claim was erroneous.
 We also reject as a matter of law CASI’s “alternative” theories as
set forth in the second certified claim. Accordingly, the decision of
the ASBCA is
 REVERSED.
 COSTS
 No costs.

 United States Court of Appeals for the Federal Circuit

 04-1006

 Gordon R. England,
 SECRETARY OF THE NAVY,

 Appellant,

 v.

 CONTEL ADVANCED SYSTEMS, INC.,

 Appellee.

NEWMAN, Circuit Judge, dissenting.

 The Navy did not appeal the decision of the Armed Services Board
of Contract Appeals that this contract was breached to the extent
found by the Board. Nor is it disputed that Contel (CASI) suffered
monetary injury by the breach. The panel majority's holding that
damages cannot be assessed because they are measured by the cost of
money is contrary to fundamental principles of commercial
relationships, and outside the scope of the "no-interest rule." Thus
I must, respectfully, dissent.
 In accordance with the contract between the Navy and CASI, CASI
provided and installed a telecommunications system, including
equipment for which the Navy estimated the maximum quantity at an
estimated cost of $36,223,371. This estimate was derived from the
line item cost per unit (CLIN B007) times the Navy's estimate of the
maximum number of units; these were the parameters of this indefinite-
quantity
contract, and the validity of their adoption is not in dispute. The
contract provided for payment by the Navy in sixty monthly
installments, to commence following acceptance of the completed
installation. It was understood, and the contract provides, that the
total cost would be based on the number of units that were actually
installed.
 Before completion of the installation it was recognized by both
the Navy and CASI that the actual cost would be several million
dollars below the stated maximum.1 Starting in January 1992 CASI
requested a downward adjustment of the contract maximum; the record
reports persistent requests by CASI for a cost reconciliation, upon
acceptance of the installation on May 11, 1992, and thereafter. All
of these requests were in vain, for four and a half years. This delay
is significant because the Navy refused to make payments to the lender
(as the financing terms required) unless the invoices were based on
the original $36,223,371 contract maximum. Thus CASI was obliged to
carry several million dollars of excess borrowing for over four years.
 In October 1996 the Navy made the appropriate contract
modification, reducing the contract cost. The Navy testified before
the Board that it knew that less equipment had been installed than was
originally projected, at lower total cost. The Board ruled that "the
Navy had a duty to reconcile the LTOP [Lease-to-Ownership Plan] price
no later than system acceptance and its refusal without a valid excuse
to do so was a breach of its duty to cooperate and a breach of the
contract." The Navy does not appeal the finding of breach; the appeal
is solely on the question of entitlement to damages.2
 The panel majority, reversing the Board, holds that the awarded
damages are "interest" and therefore barred by the no-interest rule.
That is not a proper application of the rule. These damages are not
interest on a claim against the government, whereby interest on a
monetary obligation of the government is not available unless
authorized by statute or agreed by contract. See Library of Congress
v. Shaw, 478 U.S. 310, 317 (1986) (interest does not run on a judgment
against the United States, absent consent or authorization); Komatsu
Mfg. Co., Ltd. v. United States, 131 F. Supp. 949 (Ct. Cl. 1955)
(same). The damages here at issue are the direct cost to the
contractor of the government's breach of contract.
 The panel majority states that "[t]he no-interest rule is an
aspect of the basic rule of sovereign immunity." Op. at 10. The
basic rule of "sovereign immunity," that the ruler could not be sued
without his consent, was not directed to interest, but to the
underlying liability. The ancient bar to recovery of interest when
there was a valid underlying obligation reflects the canonical and
common law prohibitions of usury, not the divine right of kings. See
Shaw, 478 U.S. at 315 (citing C. McCormick, Law of Damages, Sec. 51,
p. 508 (1935) (in early common law, interest was allowed only by
agreement of the parties, and was limited in amount)). As discussed
in Shaw, 478 U.S. at 315-16, the government has been permitted to
"occupy an apparently favored position" (quoting United States v.
Verdier, 164 U.S. 213, 219 (1896)). Enlarging the
government's freedom from liability for breach of its obligations is
unwarranted. "Sovereign immunity" is not a tool of unfairness to
those who do business with government. It should not be uncritically
expanded.
 The Board's decision in favor of CASI was not an award of
interest on a claim against the government or a judgment against the
government or a debt of the government. The Board recognized that
monetary injury resulted from the Navy's refusal to cooperate in
reconciling the contract after completion of installation, for this
breach required CASI to maintain higher borrowing than was needed.
This is not a situation in which the contractor had to borrow
additional sums to perform a contract after it was breached by the
government, as in J. D. Hedin Constr. Co. v. United States, 456 F.2d
1315, 1330 (Ct. Cl. 1972). The Hedin court held that interest on
"bank loans made because of financial stringency resulting from a
breach by the Government of a contract between it and the borrower is
not recoverable as an item of damage." And the Navy's breach herein
was not "a breach of contract to pay money which results only in a
delay in payment," as in Ramsey v. United States, 101 F. Supp. 353,
356 (Ct. Cl. 1951); there was no issue of delay in payment.
 CASI alternatively pointed out that even on the government's
theory that the damages should be treated as retaining their identity
as interest on the LTOP borrowing, the Lease-to-Ownership Plan
included a factor for interest. The Board found: "The Navy chose the
LTOP option based on a present value analysis based on a 10% interest
rate." Thus CASI offered the argument that the contract provides for
payment of the obligation that CASI actually incurred, thereby waiving
recourse to a no-interest rule. It was undisputed that the contract
cost included recovery of the interest incurred in the LTOP option.
 When damages flow from breach of an obligation that involves
money, the nature of the obligation and its relationship to the
economic injury must be considered in determining whether the cost of
money is properly included in damages. In this case, the correctness
of that measure is not challenged by the panel majority. The
liability assessment by the Board of Contract Appeals does not
conflict with law, and implements the national policy of fairness to
contractors. See Rumsfeld v. Applied Co., 318 F.3d 1317, 1336 (Fed.
Cir. 2002) (the non-breaching party is entitled to the damages that
would place it in the position it would have occupied absent the
breach); Mass. Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232
(Fed. Cir. 1997) (same). The Board's award of damages in the
circumstances of this case is not barred by statute or precedent.
From the court's contrary ruling, I respectfully dissent.

 1
 The October 1996 modification decreased the LTO price by
$6,978,825.08 to account for the overestimates to CLIN B007. The
modification also proposed to purchase a switch upgrade for
$2,527,769.00. The net decrease in LTO price was $4,451,056.08.

 2
 The ASBCA also reversed the CO’s determination that the Navy was
entitled to recover $279,464.32 from overpayments to CASI.

 3
 The Navy does not challenge on appeal the ASBCA’s denial of its
claim for overpayment.
 4
 We also reject CASI’s argument that the Navy’s appeal is not
timely because it addresses only damages issues and not entitlement.
The appeal is not directed to the quantum of damages. Rather, the
Navy “challenges the board’s holding that the Government is liable to
pay interest,” i.e., whether CASI can recover anything at all. (Reply
Br. of Appellant at 8.) In its determination of entitlement the ASBCA
properly reached this question and decided it in CASI’s favor. We
have jurisdiction to hear the Navy’s appeal from that decision.
 5
 We also reject CASI’s claim for “administrative costs” stemming
from the Navy’s “wrongful cessation of payments” to the third-party
lender. For the reasons stated above, the cessation of payment was
not wrongful.
 1

 The final audit showed a cost reduction of $6,978,825.08. Some
two million dollars of this amount were used by the Navy to purchase
other equipment; this aspect is not at issue.

 2

 The amount of damages was not determined; the Board's decision
was limited to entitlement.